CROSS COMPANY *v.* UAW LOCAL NO. 155 (AFL-CIO).

1. CONTEMPT—COURTS.

   One purpose served by a contempt proceeding is the preservation of the power and dignity of the court.

2. SAME—BENEFIT TO MOVING PARTY.

   All contempt proceedings are likely to confer benefits upon the party moving for adjudication of contempt, since they necessarily involve adverse parties already in litigation.

3. SAME—COURTS—STATUTES.

   State courts have inherent power to punish for contempt, and the statute declaratory of such common-law power does not restrict that power (CL 1948, § 605.1 *et seq.*).

4. SAME—PUNISHMENT—CRIMINAL LAW.

   Contempt proceedings wherein fines and prison sentences were imposed on a labor union and certain of its officers and members

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  17 Am Jur 2d, Contempt § 2.
[2]  17 Am Jur 2d, Contempt §§ 77, 81.
[3]  17 Am Jur 2d, Contempt § 63.
[4]  17 Am Jur 2d, Contempt § 104.
[5, 9]  17 Am Jur 2d, Contempt § 64; 31 Am Jur, Jury §§ 38, 39
   Legislative power to abridge, limit, or regulate power of courts with respect to contempt. 121 ALR 215.
[6]  28 Am Jur, Injunctions §§ 323, 324.
[7]  17 Am Jur 2d, Contempt § 84.
[8]  53 Am Jur, Trial § 12.
[10, 12]  17 Am Jur 2d, Contempt § 84 *et seq.*
[11, 18, 19]  53 Am Jur, Trial § 95.
[13, 14]  58 Am Jur, Witnesses § 25.
[15, 16]  28 Am Jur, Injunctions § 297.
[17]  5 Am Jur 2d, Appeal and Error §§ 831, 882, 883.
[20, 21]  17 Am Jur 2d, Contempt §§ 104, 105.
[22]  17 Am Jur 2d, Contempt §§ 35, 49, 88.
[23]  5 Am Jur 2d, Appeal and Error § 1014.

as punishment for offenses committed, and not to enforce the performance of an act, so far partook of a criminal character as to require observance of basic constitutional protections afforded to those charged with crime (CL 1948, § 605.1 *et seq.*).

5. SAME—JURY—PUBLIC POLICY.

The characterization of a contempt proceeding for offenses committed as one of a criminal proceeding does not declare that the defendant therein be afforded a jury trial, either as a matter of precedent or as a matter of public policy (CL 1948, § 605.1 *et seq.*).

6. INJUNCTION—ENFORCEMENT.

A court is empowered to enforce its orders with speed and dispatch, once it has exercised its injunctive powers.

7. SAME—CONTEMPT—JUDGES—DISCRETION OF COURT.

Trial judge who had issued an injunction which restricted picketing at plaintiff's plant and environs was not in error in himself imposing sentences of fines and imprisonment for contempt rather than having the contempt proceedings tried by another judge, whether the contempt should be tried by another judge being a matter of discretion for the judge whose orders are to be obeyed (CL 1948, § 605.1 *et seq.*).

8. CONTEMPT—PREPARATION FOR DEFENSE AGAINST CITATION.

What constitutes a reasonable time for preparing to defend against a citation for contempt must be viewed in the context of the entire situation.

9. SAME—JURY—PETTY OFFENSES.

Summary trial without a jury on citation for contempt was proper, where penalty imposed was that for petty offenses.

10. SAME—DUE PROCESS—TIME.

Due process was not denied appellant union and certain of its officers and members, where plaintiff employer had obtained a temporary injunction on August 19th, charged that certain contempts occurred during next 33 days on petitions filed September 2d, 17th, and 21st, hearing was had on September 24th and 29th on which last date cross-examination of witnesses was conducted (CL 1948, § 605.3).

11. SAME—EVIDENCE.

Charge of contempt as to individual who is not shown to have engaged in acts of violence or to have been with a group when such acts were committed, is ordered dismissed.

12. Same—Due Process.

Individual defendants and union who were charged with various offenses and having engaged in illegal threats, specific acts of violence, and mass picketing, in violation of temporary injunction issued theretofore *held*, to have been charged in the mode provided by statute and not to have been denied due process, having been given notice and a chance to defend (CL 1948, § 605.3).

13. Witnesses—Subpoena Duces Tecum.

Refusal of trial court to require plaintiff employer to produce everything pursuant to blanket demand of subpoena *duces tecum* of all records and reports of investigations, including memoranda, statements, communications, and correspondence relating to all strike activities on and after date of temporary injunction mentioned in any and all affidavits filed in the cause *held*, not error, since there was a failure to specify documents sought with as much precision and particularity as possible.

14. Same—Subpoena Duces Tecum.

A subpoena *duces tecum* must specify with as much precision as is possible the books, papers, or documents desired, and the period covered must be reasonably limited.

15. Injunction—Union Members—Contempt—Knowledge.

There is no presumption of knowledge of the provisions of an injunction by a striking member of a union, it being necessary to establish actual knowledge in order to hold him in contempt, but actual knowledge may be inferred from the facts.

16. Same—Contempt—Knowledge.

Finding that union and 8 of the defendants, charged with contempt in committing acts of violence in connection with violations of injunction restricting mass picketing at plaintiff's plant, had knowledge of the month old temporary injunction *held*, proper, where 3 defendants admitted knowledge, another never denied it, and issue is not raised as to others.

17. Contempt—Appeal—Supreme Court—Weight of Evidence—Credibility.

The Supreme Court does not weigh the evidence or the credibility of witnesses on appeal of a conviction for contempt.

18. Same—Findings—Evidence.

Findings of a lower court in contempt proceedings are affirmed, where there is competent evidence to support them.

19. SAME—INJUNCTION—EVIDENCE.

Adjudication that 8 union officers and members were guilty of contempt *held,* supported by competent evidence of various acts of violence or participation in mob activity contrary to injunction recently theretofore issued (CL 1948, § 605.1 *et seq.*).

20. SAME—SENTENCE.

Additional portion of sentence whereby individual defendants who were fined and given a jail sentence and then an additional jail sentence for a fixed term upon failure to pay the fine *held,* not authorized by contempt statute under which proceeding had been conducted (CL 1948, § 605.20).

21. SAME—SENTENCE INVALID IN PART.

Only that part of a sentence for contempt in excess of what is allowed by law need be declared invalid and reversed or annulled by an appellate court, where a portion of the sentence was legitimately imposed (CL 1948, § 769.24).

22. SAME—UNION—RESPONSIBILITY—INJUNCTION.

Evidence supported trial judge's finding that defendant union was guilty of contempt by reason of the fact that it had participated in and was responsible for acts which had occurred in violation of injunction issued shortly theretofore.

23. COSTS—NEITHER PARTY PREVAILING IN FULL.

No costs are allowed on appeal by union and 9 of its officers and members from adjudications of contempt, where 1 member has been dismissed and invalid portion of sentences of other individuals has been annulled, since the plaintiff and appellants have each prevailed in part (CL 1948, § 605.1 *et seq.*; § 769.24).

Appeal from Macomb; Noe (Alton H.), J. Submitted June 9, 1965. (Calendar No. 7, Docket No. 50,509.) Decided February 8, 1966.

Bill by Cross Company, a Michigan corporation, against United Automobile, Aircraft, and Agricultural Implement Workers of America, Local No. 155, affiliated with AFL-CIO, Russell Leach, its president, and various individuals in official capacities in union, to restrain illegal picketing in connection with labor dispute. Temporary injunctions

issued. Cross-bill by defendant union to enjoin operations in plaintiff's plant until company bargains with union as exclusive representative of employees. Cross-bill dismissed. Order entered granting permanent injunction. Defendants appeal. Affirmed, with grant of leave to appeal to Local No. 155, Russell Leach, Archie Beveridge, Theodore VanEe, Anthony Palmeri, Peter Kapuscinski, Joseph Horonzy, Leo Herbert, Gordon Buchanan, and Gus Caravas from orders adjudging them in contempt for violating injunctions. See 371 Mich 184. On appeal from contempt proceedings, citations affirmed and modified, except as to Gus Caravas whose cause is dismissed.

*Clark, Klein, Winter, Parsons & Prewitt (Robert C. Winter, H. William Butler, and Douglas E. Peck, of counsel), for plaintiff.*

*Livingston, Gregory, Van Lopik & Cranefield (Winston L. Livingston and Nancy Jean Van Lopik, of counsel), for defendants.*

ADAMS, J. This is an appeal from orders adjudging a union local and nine persons, officers or members of the union, guilty of contempt for violation of a temporary injunction. In a first appeal of this matter, *Cross Company v. UAW Local No. 155,* 371 Mich 184, it was decided: (1) that the trial court had jurisdiction to enter the temporary injunction, and (2) that the issuance of the injunction was supported by the record. Justice SOURIS then wrote (p 188):

"The parties to this appeal have been locked in mortal combat for over a decade."

On the morning of August 4, 1959, the combat erupted into a strike. The same day, the company

obtained an *ex parte* restraining order. August 7th the order was vacated upon assurances from the union and the sheriff that picketing would be peaceful and order maintained. Order was not maintained. The judge was presented with evidence of mob rule and violence. On August 19th, he issued a temporary injunction.[1] On September 2d, 17th, and 21st, the company filed petitions for adjudication of contempt for violations of the injunction. After hearings on the petitions, the judge made findings of contempt. In their brief, defendants state:

"Appellants [defendants] concede that various incidents of vandalism, violence, intimidation, and threats occurred intermittently during the period August 19th to September 21st. These included the spatting upon, scratching and striking of automobiles with rocks or other objects. Persons in or near the picket line also tried, on occasion, to open the doors of passing automobiles and waved their fists

---

[1] The restraints upon the union, its officials and members, in the temporary injunction are as follows:

"(1) In any manner obstructing or interfering with the free ingress to or egress from plaintiff's plant in the city of Fraser, Macomb county, Michigan, on the part of the employees or customers of the Cross Company or others.

"(1) [2] From in any manner hindering or preventing by unlawful threats or charges or by mass picketing or congregating in large numbers at the entrances or place of ingress or egress to the Cross Company premises in Fraser, Michigan, or on the public highways at or near the entrances thereof, the pursuit of their lawful work or employment by employees of the Cross Company.

"(3) Encouraging, inducing, calling, procuring, authorizing, inciting, carrying out or otherwise causing the employees of the Cross Company, or others, to engage in mass picketing or congregating in large numbers at the entrances to the Cross Company premises at Fraser, Michigan, or at or on the public highways at or near the Cross Company's premises.

"(4) From picketing the said plant with a total number of pickets exceeding 20 at any one time, and shall at all times leave unobstructed a passage way through the company gate at least 10 feet in width.

"(5) From by force or unlawful threats to force or attempt to force any person to refrain from engaging in employment at the Cross Company at its plant on Fourteen Mile road in Fraser, Michigan."

at the occupants. Witnesses also testified that at various times during this period, unidentified persons in the picket line and in the group on the south side of 14 Mile road shouted obscene, foul, and threatening language at nonstrikers and other persons passing in and out of the plant.

"On the mornings of September 15th and September 18th, a large number of persons congregated in front of the gate. There was mass assembly and disturbances on both occasions. On September 15th, the number reached an estimated total of 400–800 in the vicinity of the plant. The crowd overturned an automobile, injuring one of its six occupants, and then interfered with the progress of a wrecker and ambulance called to the scene. Another automobile driven by a nonstriker (Boza) was stoned and hit by a 'paint bomb' and turned back from the plant. The massed assembly precluded any one from entering plaintiff's plant for several hours. On September 18th, another large group, estimated at 800–1000, gathered in front of the premises but police barred all traffic on 14 Mile road, thereby precluding admission to the plant until the group dispersed around 10 a.m.

"Appellants disclaimed responsibility for the incidents of vandalism, violence, threats and further denied any responsibility for the congregations at the plant on the morning of September 15th and 18th and the conduct of the people so assembled."

I.

The first question presented is the nature of this contempt proceeding. One purpose served by such a proceeding is the preservation of the power and dignity of the court. This aspect has been repeatedly recognized in Michigan. *People, ex rel. Messler,* v. *Simonson,* 9 Mich 492; *In re Chadwick,* 109 Mich 588, 596; *Great Lakes Greyhound Lines* v. *International Union, UAW-CIO,* 341 Mich 290, 301,

appeal dismissed, 350 US 804 (76 S Ct 45, 100 L ed 723). Consequently, Judge Noe did not err when he stated:

"This is strictly a matter of disobedience of a court order. As I have said many times, it has nothing to do with the actual controversy which exists between the company and the employees."

While recognizing this facet of the proceeding, Judge Noe and the parties also regarded it as in the nature of a criminal one. In one colloquy, Judge Noe observed:

*"It has some criminal aspects* so far as punishment is concerned." (Emphasis supplied.)

Appellants' counsel so viewed the proceedings. He stated:

"Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent. He must be proven to be guilty beyond a reasonable doubt and cannot be compelled to testify against himself.  *  *  *[2]
"Certainly this warrants the serious consideration and the safeguards and the sober reflection that deliberation and consideration, which clothes criminal proceedings and which is part of our system."

On another occasion, counsel for appellants stated:

"Contempt proceedings should not be used as an aid to the company in this sort of a situation, the contempt being criminal, to vindicate the authority of the Court."

All contempt proceedings, because they necessarily involve adverse parties already in litigation,

---

[2] See, *Gompers* v. *Buck's Stove & Range Company,* 221 US 418, 444 (31 S Ct 492, 55 L ed 797).

are likely to confer benefits upon the party moving for adjudication of contempt. If the endeavor is to enforce the payment of alimony or to compel some desired action, the benefit is obvious. In other situations, the benefit may be more subtle though no less real. While no doubt there are certain civil aspects to this proceeding, they need not here be further pursued because, when one is charged with a crime, the law is more exacting for the protection of individual rights than is the case with the civil law. The crucial question is whether the contempts here charged[3] are criminal.

The controlling element in the proceeding was the clearly envisioned possibility throughout of fines and imprisonment as provided in the statute.[4] The union was fined. Individual defendants were fined and given prison sentences. Those sentences were in the nature of punishment for offenses committed, not to enforce the performance of an act. The proceedings, therefore, had to be carried on in observance of basic constitutional protections afforded to those charged with commission of a crime.

---

[3] While Michigan courts have inherent power to punish for contempt (*In re Scott*, 342 Mich 614, 618), the proceedings in this case followed the Michigan contempt statute (CL 1948, § 605.1 *et seq.* [Stat Ann § 27.511 *et seq.*]). The statute has since been adopted as part of the revised judicature act (CLS 1961, § 600.1701 *et seq.* [Stat Ann 1962 Rev § 27A.1701 *et seq.*]). This statute is declaratory of the common-law power of Michigan courts to punish for contempt and does not restrict those powers. *Langdon* v. *Wayne Circuit Judges*, 76 Mich 358, 367; *In re Scott*, *supra*.

[4] "Punishment for contempts may be by fine or imprisonment in the jail of the county where the court may be sitting, or both, in the discretion of the court; but the fine shall in no case exceed the sum of 250 dollars, nor the imprisonment 30 days; except in those cases where the commitment shall have been for the refusal to perform an act or duty which is still within the power of the party to perform." CL 1948, § 605.20 (Stat Ann § 27.530), substantially reenacted in the revised judicature act (CLS 1961, § 600.1715[1] [Stat Ann 1962 Rev § 27A.1715(1)]).

## II.

While we categorize this as being a criminal proceeding, it does not follow that it must have all the attributes of the usual criminal proceeding—one of which is trial by jury. Contempt, it has been said, is an anomaly.[5] In view of the long historical development of contempt proceedings under the authority of a judge, we are not ready—as the United States Supreme Court has not been ready—to declare it is a necessary constitutional prerequisite to a criminal contempt proceeding that a defendant be afforded a jury trial. *United States* v. *Barnett,* 376 US 681 (84 S Ct 984, 12 L ed 2d 23). See, 63 Mich L Rev 700, Constitutional Right to Jury Trial in Criminal Contempt Cases. See the cases collected in *In re Huff,* 352 Mich 402, 415, 416.

Nor are we willing to declare as a matter of public policy that such a defendant should be afforded a jury trial. While there are strong arguments for this viewpoint, as long as one of the primary reasons for the contempt procedure is to vindicate the power and authority of a court, there are compelling reasons against taking this step.

It was stated in the original *Cross Case, supra,* pp 194–197, that the initial decision of a court to exercise its injunctive powers is one which ought to be exercised with utmost discretion and reserve. Once that authority has been asserted, however, there is much to be said for preservation by the court of its power to enforce orders issued with speed and dispatch, even summarily. This present case is an excellent example. Until the court moved to enforce its decree, disobedience to the court's orders was repeated.

---

[5] "The power of a judge to inflict punishment for criminal contempt by means of a summary proceeding stands as an anomaly in the law." Justice Black, dissenting, in *Green* v. *United States,* 356 US 165, 193 (78 S Ct 632, 2 L ed 2d 672).

### III.

Likewise, we cannot agree with appellants that there is an overriding element of public policy that would require trial of a contempt proceeding by another judge. In some cases transfer might be appropriate, but the matter is one for the sound discretion of the judge handling the original proceeding. Can the charge of contempt be readily separated from that proceeding? To what extent is there danger the judge may find himself acting as an inquisitor rather than as an impartial judge? See *In re Murchison,* 349 US 133, 136 (75 S Ct 623, 99 L ed 942), *Ungar* v. *Sarafite,* 376 US 575, 584 (84 S Ct 841, 11 L ed 2d 921), rehearing denied, 377 US 925 (84 S Ct 1218, 12 L ed 2d 217). Will the contempt proceeding be unduly delayed by transfer? Is another judge readily available? These are a few of the questions to be weighed and considered. Here the trial judge exhibited patience and restraint in a difficult situation. We find no error.

### IV.

Appellants contend they were denied due process of law because they were compelled to trial on petitions for adjudication of contempt without a reasonable time to prepare their defense. What constitutes a reasonable time must be viewed in the context of the entire situation. The trial court first moved into this matter on August 4, 1959. On August 7th, he vacated the temporary *ex parte* injunction upon the representation of the union that it could control the situation. On August 19th, because the situation was not controlled, he issued the temporary injunction. The contempts charged occurred between August 19th and September 21st.

Before proceeding to hearing on September 24th, the trial judge had issued a show cause order returnable September 10th on the September 2d petition. The hearing was adjourned. The September 17th and 21st petitions were heard first, beginning September 24th. Only one witness testified that day. The matter was adjourned until Tuesday, September 29th. No hearings took place through September 25th to 28th and counsel for plaintiff was not required to conduct any cross-examination or present any witnesses until Tuesday, September 29th.

While the charges against the defendants were serious, they fall within the category of petty offenses noted by the United States Supreme Court in *United States* v. *Barnett, supra.*[6] In the light of all the circumstances, including the adjournment of the September 2d petition, the time granted was reasonable. See *In re Huff, supra,* 413. There was no denial of due process.

## V.

Defendants claim that the petitions and affidavits were defective in form and substance in that they failed to advise them of the charges against which they were required to defend. The affidavits set forth one or more alleged offenses against a general background of mob rule and lawlessness. The individual defendants are alleged to have engaged in illegal threats, specific acts of violence, mass picketing, or to have been in such close association with these activities as to have been a part of what

---

[6] "In view of the impending contempt hearing, effective administration of justice requires that this *dictum* be added: Some members of the Court are of the view that, without regard to the seriousness of the offense, punishment by summary trial without a jury would be constitutionally limited to that penalty provided for petty offenses." (Footnote 12, page 695.)

took place. Only with regard to defendant Gus Caravas is there an insufficient specification to render the charge of contempt fatally defective. He is mentioned in two affidavits. In the affidavit of Burnise Thaxton the following is stated:

"At about 6:10 a.m. I observed two Cross Company employees, who were still on strike, near the railroad track. They were Tony Palmeri and Peter Kapuscinski. These two men were stooping down on the railroad bed and picking up stones and rocks which they put in their pockets. Because of the power of the telescope I could see the stones in their hands. Both of these men are known to me personally. As these men were picking up the stones four other striking Cross Company employees joined them. They were Chet Pierson, Art Ferdinand, Henry Riley, and Gus Caravas. Although *these men did not pick up stones* they stayed with the others. The next observation I made of this group of six men was that they walked from the railroad track toward Groesbeck highway." (Emphasis supplied.)

The only other mention of Gus Caravas is in the affidavit of Herbert E. Lambka, in which affidavit the following sentence appears:

"I noticed that there were only 1 or 2 Cross Company employees in the picket line in front of the gate, among them Gus Caravas and Michael Oravac —one of the shop committee employees."

It will be noted that Caravas is not shown in either affidavit to have participated in stone throwing or to have been with a group when stone throwing occurred. He is not shown by the affidavits to have participated in the mass picketing which was going on when he was on the authorized picket line. Because the above statements in the affidavits are insufficient to support a charge of contempt, the

trial judge should have dismissed the proceeding as to Caravas.

As for the other defendants, while the affidavits do not set forth the charges against them in the form and detail of a criminal information, they were informed as to specific offenses with which they were charged in the mode provided by the statute. See *In re Gilliland,* 284 Mich 604, 610.

The procedure set forth in the contempt statute is not as elaborate as that followed in the criminal process comprised of warrant, information, arraignment, and examination. See 1 Gillespie, Criminal Law, § 335, p 402. It allows notice and a chance to defend[7] which is essentially the purpose of a criminal procedure. The statute sufficiently safeguards individual liberty as not to violate due process.

## VI.

It is claimed the court erred in refusing to require Cross Company, for cross-examination purposes by defendants, to produce records and reports made to its representatives concerning strike activities. The subpoena requested:

"All records and reports of investigations, * * * (including original memoranda, statements, communications, and correspondence, made by you, your agents, employees, or persons under contract with you) relating to all strike activities at your plant in Fraser, Michigan, on and after August 19, 1959, and all incidents mentioned in any and all affidavits filed by you or your attorneys in the above entitled cause after said date."

---

[7] The statute in force at the time, CL 1948, § 605.3 (Stat Ann § 27.513), provided: "The court shall be satisfied by due proof, by affidavit of the facts charged, and shall cause a copy of the affidavit to be served on the party accused, a reasonable time to make his defense." (See, currently, CLS 1961, § 600.1711 [Stat Ann 1962 Rev § 27A.1711].)

Involved here was a subpoena *duces tecum* for the production of written evidence at trial as distinguished from a pretrial discovery proceeding. The subpoena, in essence, asked for everything concerning the cause at issue. The rule with regard to a subpoena *duces tecum* is stated in 97 CJS, Witnesses, § 25, pp 390, 391:

"It must specify with as much precision and particularity as is possible the books, papers, or documents desired, and the period covered must be reasonably limited. Under this rule, the meaning of 'reasonable' depends on the particular facts of each case, so that prior decisions are of limited value; and in determining the reasonableness of the period and subject covered by the subpoena, the type and extent of the investigation, the materiality of the subject matter to the type of investigation, the particularity with which the documents are described, the good faith of the party demanding the broad coverage, and a showing of need for such extended coverage are factors to be considered."

See, also, 58 Am Jur, Witnesses, § 25, p 36.

In this case the court did require the production of movies and photographs. Since no attempt was made by defendants' counsel to limit the subpoena, the trial court did not err in his disposition of the blanket demand.

## VII.

Appellants raise the question as to whether the provisions of the injunction can be presumed to have been known by striking members of the union who were not served with it. There is no presumption of knowledge of the provisions of an injunction by a striking member of a union. Actual knowledge must be established. *Great Lakes Greyhound Lines* v. *International Union, UAW-CIO, supra,* pp 308, 309.

Appellants Palmeri, Herbert, Kapuscinski, and Horonzy, were not served with the injunction. The petitions for orders to show cause alleged knowledge by them. Neither the appellants' motions to dismiss nor answers denied it. Plaintiff's proof showed that the injunction received wide publicity. It was posted on a bulletin board in the union trailer and on a telephone pole immediately adjacent to the picket line. Its existence was communicated to those who served on the picket line. Actual knowledge may be inferred from the facts. It was shown that each of the appellants, members of the local, had been present at the situs of the picketing. The injunction had been in force for nearly one month when appellants committed the acts of contempt on September 15th. The present case differs from *Greyhound, supra.* In *Greyhound,* the order to show cause for contempt came one day after the injunction was issued. From all of the facts, at the conclusion of plaintiff's proofs an inference was justified that defendants had had notice. While such a finding might have been rebutted, Herbert, Kapuscinski, and Horonzy admitted that they knew of the injunction and Palmeri never denied such knowledge. The issue is not raised as to the other defendants.

## VIII.

Appellants contend that the adjudications of contempt were not based upon proper findings and were not supported by competent evidence. First, in his opinion the trial judge, in a separate paragraph dealing with each individual defendant, made findings of commission of one or more acts forbidden by the injunction. Upon appeal of a conviction for contempt this Court does not weigh the evidence or the credibility of witnesses. *In re Gilliland,* 284

Mich 604, 612. The findings of the lower court must be affirmed if there is competent evidence to support the findings. *In re Slattery*, 310 Mich 458, 477. Except for Gus Caravas, the acts alleged in the affidavits attached to the petitions for adjudication of contempt are supported by the testimony and findings of the judge.

Archie Beveridge, an officer of Local 155, is charged, in the affidavit of Earl Rausch, with being present on the morning of Tuesday, September 15, 1959, at the time when a large number of persons congregated at the Cross Company gate:

"I also saw Archie Beveridge, whom I know to be an officer of Local 155 UAW-CIO near the company gate among the men there congregated."

In the affidavit of Joseph O. Rein, Beveridge is charged with making the following threat on Saturday, September 19, 1959:

"As my car passed through the picket line, Beveridge leaned in, pointed his finger at me and said 'We are going to get you.' "

Rausch testified Beveridge was present in the mob on the morning of September 15th. Rein testified as to the threat. His testimony is supported by Hans Ehmcke. The trial judge found that Beveridge made the threat against Rein, and that Beveridge had generally conducted himself in a threatening manner toward individuals entering the plant.

Theodore VanEe, a vice-president of Local 155, is charged in the affidavit of Burnise Thaxton with being present on September 15, 1959, at the Cross Company plant:

"Among other people I saw milling around was Mr. Ted VanEe who I recognized as vice-president of Local 155."

He is also charged in the affidavit of James C. Allen with being present on the same occasion:

"I [A] large number of men and automobiles congregated along 14 Mile road between these hours, at times there being over 200 men. Among the people gathered along 14 Mile road and in the vicinity of the Cross Company gate, I saw many men wearing shirts and caps labeled UAW-CIO. During this period, I saw *among the men thus congregated* Ted VanEe, a vice-president of Local 155 UAW-CIO. I saw him at least five times. I also saw him enter and leave the union trailer, which is parked on the southerly side of 14 Mile road opposite the company gate." (Emphasis supplied.)

He is charged in the affidavit of Arthur Sierota with making the following threat after the car of Joseph D'Amico, in which Sierota was riding, was overturned on the morning of September 15, 1959:

"We were in the police car as it was backing up to get away from the scene, Ted VanEe of Local 155, UAW-AFL-CIO, yelled at us, 'See what you get?'"

VanEe's presence on September 15th was testified to by Albert Vanlanot, James C. Allen, and Burnise E. Thaxton. Albert Sierota testified with regard to the threat. The trial judge found that VanEe made the threat to Sierota and that he generally encouraged the mob activities at the plant.

The affidavit of Burnise Thaxton states that on September 15, 1959, he saw Antonio Palmeri, a member of the union, picking up stones and rocks which Palmeri put in his pocket. Palmeri is charged as follows in the affidavit of Roy Boza:

"I then saw Tony Palmeri throw a large stone which hit a window in the right-hand rear door of my Rambler station wagon smashing it."

The testimony of Thaxton and Boza is to the same effect as their affidavits. The trial judge found that Palmeri was a member of the group that threw stones and engaged in other conduct contrary to the injunction.

The affidavit of Burnise Thaxton states that he saw Peter Kapuscinski, a member of the union, picking up stones and rocks on September 15, 1959. Kapuscinski is charged in the affidavit of Roy Boza with being present in a group of 10 or 15 men when rocks were thrown at Boza's car. The testimony of Thaxton is to the same effect as his affidavit. The testimony of Boza identifies Kapuscinski as part of a group that threw stones at his car, paint-bombed it, and made various threats to the occupants. Kapuscinski was found guilty of making threats.

The affidavit of Roy Boza charges that Joe Horonzy was present in a group of 10 to 15 men with Pete Kapuscinski on the morning of September 15, 1959, when Boza's car was stoned. Boza's testimony is as follows:

"And the crowd just kept coming in with the car, 'Let's get them. Let's get them. Let's get them.' They kept hollering, 'Let's get these scabs.' * * *

"*Q*. And the windshield had been broken?

"*A*. The windshield was broken. One of the side paneling glasses in the rear of the station wagon was busted. One of the small windows on the opposite side of the driver, that would be the back seat, was broken. That was broken by Tony Palmeri.

"*Q*. You saw him?

"*A*. Yes, I did. I seen him.

"*Q. Did you recognize any others in the group?*

"*A*. Yes, I did. *I recognized Joe Horonzy, Leo Herbert, and Pete Kapuscinski.*

"*Q*. Where were they located?

"*A*. Pete Papuscinski [Kapuscinski] and Joe Horonzy was on to the right, that would be on the

north side of 14 Mile road. And Leo Herbert was on south side of 14 Mile road with the group that was there.

"*Q.* You turned around you say after this incident?

"*A.* Yes, sir. I had not turned around. The sheriff thought it would be better if we got out of that area for some reason or another.

"*Q.* Did he tell you that?

"*A.* Yes, he did. He said that. And I told him I couldn't see. I couldn't drive out because of the windshield.

" 'Well,' he said, 'do the best you can until we can get you in the clearing.'

"And he directed me to go through the gasoline station. And *this crowd of 25 or 30 just kept following.* 'Let's get these guys. Let's get these guys.' More or less to say: 'Let's make a lesson of this.' " (Emphasis supplied.)

Horonzy was found guilty of making threats.

Leo Herbert, a union member, is charged in the affidavit of Roy Boza with being present in a large group on the southerly side of 14 Mile road on the morning of September 15, 1959. Boza's testimony as to Herbert's involvement in the group action against Boza's automobile has already been quoted. Herbert was found guilty of making threats.

Gordon Buchanan is charged, in the affidavit of Herbert E. Lambka, with being present on September 18, 1959, at the time a mob gathered at the Cross Company plant:

"During this time I also observed Gordon Buchanan, an international representative of the union, mixing with the mob."

The testimony of Lambka is to the effect that Buchanan was present on September 18th when a large crowd assembled at the Cross Company plant and was observed to have been mingling with the

crowd in front of the plant. Buchanan, although admitting he was present when the crowd gathered, claimed he stayed in the union trailer. If the testimony of Lambka is believed, it must be concluded Buchanan was a participant in the mob activity, there being no other explanation of his presence in the crowd. We must presume from the trial court's judgment that he believed Lambka. Buchanan was found guilty of participating in the mob action. The judge mistakenly stated he was present September 15th rather than September 18th.

Russell Leach is charged in the affidavit of Francis Yeomans with participating in the picketing of the home of Walter Karita where a number of nonstrikers were staying. Yeomans' affidavit states:

"These men on the sidewalk kept shouting in a menacing way 'Come on out'. Russell Leach, President of Local #155, was with this group of people. He stood on Fraser drive near the corner of 14 Mile road directing the people. I watched him talking to them."

The testimony of Yeomans is to the same effect as his affidavit. The trial judge found that Leach conferred with the picketers and led members of Local 155 in picketing the Karita home.

This sequence of affidavits, testimony, and findings is immersed in a mass of other material. Likewise, there are interspersed with the judge's findings many comments with regard to the general situation at the Cross gate and with regard to admissions and statements by the defendants. The judge's opinion then proceeds to a finding of contempt by the union in which he rounds out the total picture of contemptuous activities to which he had alluded piecemeal. The better procedure would have been for the trial judge to confine each portion of his opinion dealing with an individual defendant to the charge against

that defendant, the testimony to support the charge, and his finding. Though presentation by the trial judge of his findings leaves much to be desired, the findings were not erroneous as to substance. We, therefore, do not reverse.

## IX.

It is claimed that the sentences imposed are void for failure to comply with the governing statute (CL 1948, § 605.20 [Stat Ann § 27.530]).[8] It provided, in part:

"Punishment for contempts may be by fine or imprisonment in the jail of the county where the court may be sitting, or both, in the discretion of the court."

Each individual defendant was given a monetary fine and a jail sentence *with a proviso for an additional jail sentence for a fixed term upon failure to pay the fine.* The alternative jail sentence was not authorized by the statute. See 2 Gillespie Michigan Criminal Law, § 742(b), p 939.

While courts have inherent power in contempt matters, we have construed this proceeding to have been under the Michigan contempt statute. Since that statute does not authorize a court to imprison for a *fixed* jail term for failure to pay a fine, such portion of the sentence of each individual defendant is vacated. This procedure is in conformity with Michigan criminal practice provided in CL 1948, § 769.24 (Stat Ann 1954 Rev § 28.1094):

"Whenever, in any criminal case, the defendant shall be adjudged guilty and a punishment by fine or imprisonment shall be imposed in excess of that allowed by law, the judgment shall not for that rea-

---

[8] See, currently, CLS 1961, § 600.1715 (Stat Ann 1962 Rev § 27A-.1715).—REPORTER.

son alone be judged altogether void, nor be wholly reversed and annulled by any court of review, but the same shall be valid and effectual to the extent of the lawful penalty, and shall only be reversed or annulled on writ of error or otherwise, in respect to the unlawful excess."

## X.

It is claimed the trial court applied an improper rule of responsibility to the union for unlawful and disorderly acts that occurred during the strike. The court withdrew its initial *ex parte* injunction upon the representation of the union that, if this was done, it would control the situation at the Cross gate. There was thereby placed upon the union a responsibility it was unable to meet. With the imposition of the injunction on August 19th, the responsibility of the union was defined by the restraints therein provided. (See footnote No 1, *supra.*)

We do not, viewed in its entirety, read the judge's adjudication of contempt against the union as going outside the bounds of his injunctive order. As noted earlier, contempt has many aspects. In this case the judge and the parties themselves viewed the proceeding, from time to time, in one or more aspects. The trial judge undoubtedly felt that there had been a failure by the union to meet the commitment made to the court. Again and again, he adverted to that commitment. However, we are unable to find that in holding the union guilty of contempt he applied that commitment as a rule of responsibility.

The judge did find the union responsible for acts of its officers and membership. A union may be found responsible for the acts of its agents and members. *Milk Wagon Drivers Union of Chicago, Local 753,* v. *Meadowmoor Dairies, Inc.,* 312 US 287

(61 S Ct 552, 85 L ed 836). We have detailed some of these acts of union officials and union members in our review of the contempt charges against the individual defendants. Even though a union is not necessarily responsible for every act of an official or a member, this record amply supports the finding by the trial judge of union participation and union responsibility for acts which occurred in violation of the injunction.

Except as to the alternative jail sentences of the individual defendants, as to Russell Leach, Archie Beveridge, Theodore VanEe, Anthony Palmeri, Peter Kapuscinski, Joseph Horonzy, Leo Herbert, Gordon Buchanan and the United Automobile, Aircraft and Agricultural Implement Workers of America Local No. 155, Affiliated with the AFL-CIO, the trial judge is affirmed. With regard to Gus Caravas, for the reason set forth in this opinion, the trial judge is reversed and the charge of contempt against Gus Caravas is ordered dismissed.

The appellants having prevailed in part and the appellee having also prevailed in part upon this appeal, no costs are awarded.

T. M. KAVANAGH, C. J., and DETHMERS, KELLY, SOURIS, SMITH, and O'HARA, JJ., concurred with ADAMS, J.

BLACK, J., concurred in result.