JAMES BLAINE HENDERSHOT, JR.

*v.*

JENNIE LOU HENDERSHOT

(No. 14457)

Decided January 22, 1980.

*Hague, Rudolph, Hague & Lantz, George E. Lantz and Eugene T. Hague* for James Blaine Hendershot, Sr.

*Richardson & Richardson, William B. Richardson and William B. Richardson, Jr.*, for Jennie Lou Hendershot.

MILLER, JUSTICE:

In this appeal from a criminal contempt proceeding, the appellant, James Hendershot, Sr.,[1] urges that his constitutional right to a trial by jury was violated.

Appellant was sentenced to serve 90 days in jail and fined $500 on a charge that he violated a court order in a divorce case which required appellant's son to relinquish custody of his child—appellant's grandson—to the son's wife. The petition for contempt alleged that appellant had conspired with his son to remove the child from the State. We considered some of the procedural aspects of this case in *Hendershot v. Handlan*, ____ W.Va. ____, 248 S.E.2d 273 (1978).

At the hearing on the contempt charge, the appellant requested a trial by jury, but this was refused by the trial court.

Appellant argues that Article III, Section 14 of the West Virginia Constitution[2] affords an absolute right to a jury trial for all crimes and misdemeanors, and that criminal contempt is a crime. He acknowledges that *Bloom v. Illinois*, 391 U.S. 194, 20 L. Ed. 2d 522, 88 S.Ct.

---

[1] This case comes to us styled in the names of the original parties to the divorce action. The better practice in criminal contempt would be to style the proceeding State v. ____.

[2] The material portion of Article III, Section 14, states:

"Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay. . . ."

1477 (1968), sets a federal constitutional right to a jury trial in cases where the potential punishment involves imprisonment for more than six months.

In *Bloom*, the Supreme Court abandoned its traditional position, exemplified in *Green v. United States*, 356 U.S. 165, 2 L. Ed. 2d 672, 78 S.Ct. 632 (1958), that a criminal contempt trial could be conducted without a jury regardless of the severity of the penalty imposed. *Bloom*, noting the lack of substantial common law precedent for summary proceedings in criminal contempt,[3] held that criminal contempt was in essence a crime, and expressed a fundamental concern for the potential for abuse in criminal contempt proceedings:

> "Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong

---

[3] The relevant part of Note 2, *Bloom v. United States*, 391 U.S. 194, 199-200, 20 L. Ed. 2d 522, 527, 88 S.Ct. 1477, 1480-81 (1968), states:

"The unalloyed doctrine that by 'immemorial usage' all criminal contempts could be tried summarily seems to derive from Mr. Justice (later Chief Justice) Wilmot's undelivered opinion in The King v Almon (1765), first brought to public light by the posthumous publication of his papers, Wilmot, Notes 243 (1802), reprinted in 97 Eng Rep 94. Wilmot's opinion appears to have been the source of Blackstone's view, but did not become an authoritative part of the law of England until Rex v Clement, 4 Barn & Ald 218, 233, 106 Eng Rep 918, 923 (KB 1821). Cf. Roach v Garvan, 2 Atk. 469, 26 Eng Rep 683 (Ch 1742). See discussion in 8 How St Tr 14, 22-23, 49-59, and the subsequent civil action, Burdett v Abbot, 14 East 1, 138, 104 Eng Rep 501, 554 (KB 1811); 4 Taunt 401, 128 Eng Rep 384 (Ex 1812); 5 Dow 165, 202, 3 Eng Rep 1289, 1302 (HL 1817). The historical authenticity of this view has been vigorously challenged, initially by Solly-Flood, The Story of Prince Henry of Monmouth and Chief-Justice Gascoign, 3 Transactions of the Royal Historical Society (NS) 47, 61-64, 147-150 (1886). This led to the massive reappraisal of the contempt power undertaken by Sir John Fox: The King v Almon, Pts. 1 & 2, 24 LQ Rev 184, 266 (1908); The Summary Process to Punish Contempt, Pts. 1 & 2, 25 LQ Rev 238, 354 (1909); Eccentricities of the Law of Contempt of Court, 36 LQ Rev 394 (1920); The Nature of Contempt of Court, 37 LQ Rev 191 (1921); The Practice in Contempt of Court Cases, 38 LQ Rev 185 (1922); The Writ of Attachment, 40 LQ Rev 43 (1924); J. Fox, The History of Contempt of Court (1927). On contempt generally, see R. Goldfarb, The Contempt Power (1963)."

which is punishable by fine or imprisonment or both. . . .

. . . .

"The court has long recognized the potential for abuse in exercising the summary power to imprison for contempt—it is an 'arbitrary' power which is 'liable to abuse.' Ex parte Terry, 128 US 289, 313, 32 L Ed 405, 412, 9 S Ct 77 (1888). '[I]ts exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions.' Cooke v. United States, 267 US 517, 539, 69 L Ed 767, 775, 45 S Ct 390 (1925)." [391 U.S. at 201-02, 20 L. Ed. 2d 528-29, 88 S.Ct. 1481-82]

The Supreme Court arrived at its holding in *Bloom* by an empirical analysis of the right to a jury trial as it existed in this Country at the time the United States Constitution was framed. In so doing, the Court relied on the conclusions of *Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S.Ct. 1444 (1968), and *Cheff v. Schnackenberg,* 384 U.S. 373, 16 L. Ed. 2d 629, 86 S.Ct. 1523 (1966), that historically the right to a jury trial in a criminal case did not include "petty" offenses. This term was defined in *Cheff* to be an offense for which the punishment does not exceed a six-month confinement. *Bloom* followed *Duncan's* constitutional analysis that the Due Process Clause of the Fourteenth Amendment to the United States Constitution mandated this result on the states, since the right to a trial by jury is a fundamental right embodied in the concept of due process.

Appellant argues that while *Bloom* sets the federal constitutional standard, Article III, Section 14 of the West Virginia Constitution clearly calls for a more protective standard. In this respect, *Oregon v. Haas,* 420 U.S. 714, 43 L. Ed. 2d 570, 95 S.Ct. 1215 (1975), permits a state under its constitution to set a higher standard of constitutional protection than is available under the federal constitution. We have recognized this principle in several cases. *State ex rel. McLendon v. Morton,* \_\_\_\_ W.Va. \_\_\_\_, 249 S.E.2d 919 (1978); *Waite v. Civil Service*

*Commission,* ____ W.Va. ____, 241 S.E.2d 164 (1977); *Adkins v. Leverette,* ____ W.Va. ____, 239 S.E.2d 496 (1977).

This Court has traditionally considered both civil and criminal contempt proceedings to be criminal in nature from a procedural standpoint, as expressed in *State ex rel. Arnold v. Conley,* 151 W.Va. 584, 587, 153 S.E.2d 681, 683 (1966):

> " 'Whether the proceedings are civil or criminal, a contempt of court is in the nature of a criminal offense, and the proceeding for its punishment is criminal in its character, and the rules of evidence governing criminal trials are applicable. . . .' 4 M.J., Contempt, Section 3, page 242. To the same effect, see 17 Am.Jur.2d, Contempt, Section 78, page 72; *State ex rel. Alderson v. Cunningham,* 33 W.Va. 607, pt. 1, syl., 11 S.E. 76; *State v. Davis,* 50 W.Va. 100, 40 S.E. 331; *State ex rel. Continental Coal Co. v. Bittner,* 102 W.Va. 677, pt. 2 syl., 136 S.E. 202, 49 A.L.R. 968; *State ex rel. Taylor v. Devore,* 134 W.Va. 151, pt. 2 syl., 58 S.E.2d 641; *State ex rel. Hoosier Engineering Co. v. Thornton,* 137 W.Va. 230, pt. 1 syl., 72 S.E.2d 203; *State ex rel. Taft v. Cox [State ex rel. Cox v. Taft],* 143 W.Va. 106, pt. 2 syl., 100 S.E.2d 161."

To the same effect was *State ex rel. Hoosier Engineering Co. v. Thornton,* 137 W.Va. 230, 239, 72 S.E.2d 203, 208 (1952):

> "In *State [ex rel. Ben Franklin Coal Co.] v. Lewis,* 113 W.Va. 529, 168 S.E. 812, this Court stated: ' . . . And, since a prosecution for contempt is in the nature of a prosecution for a crime, such affidavit or information should state the acts constituting the offense with as great certainty as is required in criminal proceedings. . . .' " [Citations omitted]

While we have in the past acknowledged that " '[t]he line of demarcation between acts constituting criminal and those constituting civil contempt is very indistinct,' " *State ex rel. Arnold v. Conley,* 151 W.Va. at 586,

153 S.E.2d at 683, *quoting* 17 C.J.S. *Contempt* § 5(2), it is clear that our more recent cases focus on the nature of the punishment inflicted. We stated in Syllabus Point 9 and in part of Syllabus Point 10 of *Eastern Associated Coal Corp. v. Doe,* ___ W.Va. ___, 220 S.E.2d 672 (1975):

> "In a contempt proceeding, whenever the defendant may effect his release from jail by performing such act or acts as the court directs, the contempt is civil in nature and the rules regarding criminal contempt do not apply regardless of the ultimate length of the time served in jail."

> "Whenever a defendant is sentenced to jail for a definite period of time for having failed to obey a court order, the contempt is criminal and not civil; . . ."

We also held in Syllabus Point 1 of *Floyd v. Watson,* ___ W.Va. ___, 254 S.E.2d 687 (1979), that:

> "Imposition of a fixed term of imprisonment for civil contempt is improper where the contemnor is given no opportunity to purge himself of the contempt and thus free himself from imprisonment."

In *Floyd* we elaborated on the ultimate distinction between a civil and criminal contempt:

> " '[T]he most important result of the distinction between civil and criminal contempt is the rule that if a contempt procedure is criminal in nature, the sentence must be a determinate one, while if it is civil in nature, the sentence must be coercive.' *See,* Dobbs, *Contempt of Court: A Survey,* 56 Cornell L.Rev. 183, 243 (1971). 'For this reason the authorities are in almost unanimous agreement that the imposition of a fixed term of imprisonment for civil contempt is improper where the contemnor is given no opportunity to purge himself of the contempt.' *McDaniel v. McDaniel,* 256 Md. 684 at 689, 262 A.2d 52 at 55. . . ." [___ W.Va. at ___, 254 S.E.2d at 692]

From the foregoing cases, it appears that a contempt will be deemed criminal when a jail sentence is imposed

and the contemnor is given no opportunity in the sentencing order for immediate release by purging himself of contempt by doing an act which is within his power to accomplish.[4]

The narrow question here, therefore, is whether Article III, Section 14 of the West Virginia Constitution affords a right to a jury trial in a criminal contempt proceeding where the defendant faces a potential jail sentence with no provision for immediate release by purging of the contempt. We begin by analyzing the scope of the right to jury trial in criminal cases at the time of the adoption of our State Constitution, in order to determine if there are historical characteristics of our State provisions for jury trial in criminal cases which make the petty offense limitation of *Bloom* inapplicable. The 1863 West Virginia Constitution, Article II, Section 8, provided:

> "The trial of crimes and misdemeanors, unless herein otherwise provided, shall be by jury. ..."

This same provision was carried into Article III, Section 14 of the present West Virginia Constitution, adopted in 1872, except that the provision specified "a jury of twelve men."

The 1863 Constitution contained a further provision in its Article VII, Section 10:

> "[T]he defendant, in such cases of misdemeanor or breach of the peace as may be made by law cognizable by a single Justice, when the penalty is imprisonment or a fine exceeding five dollars, shall be entitled to a trial by six jurors, if de-

---

[4] Other courts have identified the determinate sentence without the ability to purge as the hallmark of a criminal contempt. *See, e.g., Board of Education v. Shelton Education Ass'n.*, 173 Conn. 81, 376 A.2d 1080 (1977); *In re Rasmussen's Estate*, 335 So.2d 634 (Fla. App. 1975); *McDaniel v. McDaniel*, 256 Md. 684, 262 A.2d 52 (1970). We do not conceive that the term "determinate sentence" is the key to a criminal contempt. Rather, the important factor is the jail sentence without the right to immediate release by purging oneself of the contempt.

manded, under such regulations as may be pre-
scribed by law."

This provision was not carried into our 1872 Constitu-
tion, perhaps for the reason that the 1863 Acts of the
Legislature, Chapter 132, Sections 5 and 6, contained a
statute relating to trials of misdemeanors, which in ma-
terial part read:

"When the penalty authorized by law is a fine
exceeding five dollars and not exceeding ten dol-
lars, or imprisonment, the accused shall be enti-
tled to a trial by six jurors, if demanded . . . ."

In the 1881 Acts of the Legislature, Chapter 8, Section
226, the statutory right to a jury trial for a misdemean-
or in a justice of the peace court was amended to read:

"When the penalty authorized by law is a fine
exceeding five dollars, or imprisonment, the ac-
cused shall be entitled to a trial by twelve jurors,
or a less number if demanded, under the regula-
tions respecting such trials in civil suits before
justices. . . ."

This statute existed until the 1976 revision of Chapter
50, where the following right to a jury trial is found in
W. Va. Code, 50-5-8:

"Any defendant in any criminal action shall be
entitled to a trial by jury, and any such verdict
must be unanimous."[5]

In addition to these legislative expressions, we have
had, since the inception of this State, a provision permit-
ting the parties to consent to the waiver of a jury trial
in a misdemeanor case:

"In any case, except a case of felony, in which a
trial by jury would be otherwise proper, the par-
ties or their counsel, by consent entered of re-
cord, may waive the right to have a jury, and

---

[5] It should be noted that the Judicial Reorganization Amendment
to the West Virginia Constitution, ratified November 5, 1974, pro-
vides in Article VIII, Section 10, that a trial in magistrate court
"shall consist of six jurors."

thereupon the whole matter of law and fact shall be heard and determined, and judgment given by the court; or by like consent, the jury may consist of a number less than twelve, and in that case a verdict shall be as valid, and have the same effect, as if it had been found by a jury of twelve." [W. Va. Code, 56-6-11]

It was this statute which provoked one of the first discussions by this Court on the language of Article III, Section 14, providing the right to a jury trial in "[t]rials of crimes, and misdemeanors." In *State v. Cottrill*, 31 W.Va. 162, 6 S.E. 428 (1888), the constitutionality of the foregoing statutory language was challenged on the basis that there could be no waiver of the right to a trial by jury in a misdemeanor case. The Court was equally divided over the waiver question, but all judges were in fundamental agreement that Article III, Section 14 requires a jury trial.[6]

---

[6] In *State v. Cottrill*, 31 W.Va. 162, 6 S.E. 428 (1888), the four members of this Court wrote separately, and the following quotations demonstrate their unanimity on the basic question, whether Article III, Section 14 of our Constitution guarantees a right to jury trial in felonies and misdemeanors:

"Mark the language: 'Trials of crimes and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men.' This declaration, plain and unmistakable, is that trials of crimes and misdemeanors in West Virginia shall in all cases be by jury, unless somewhere else in the Constitution it is provided that they may, under certain circumstances, be in some other mode. It is not elsewhere provided in the Constitution that such trials shall be in any other mode, except in the trial of impeachments. . . ." [Johnson, J., 31 W.Va. at 181, 6 S.E. at 438]

"[Y]et *I maintain that where the constitution itself expressly or by necessary implication declares that the trial must be by a jury, that the Legislature can not, even with the consent of the accused, substitute the court in lieu of a jury, and confer upon it jurisdiction to try a cause, the trial of which has been exclusively vested in the jury.*" [Emphasis in original] [Woods, J., 31 W.Va. at 190, 6 S.E. at 443]

"Without a statute permitting the waiver of trials in misdemeanor cases, I should not hesitate to hold that no consent or waiver by the accused could confer jurisdiction upon the court to try such cases without a jury; but I am wholly unprepared to hold the statute authorizing such waiver unconstitutional." [Snyder, J., 31 W.Va. at 205-06, 6 S.E. at 451]

From the foregoing survey, it can be seen that from the time this State was formed, the framers of the West Virginia Constitutions, the Legislature and this Court have been unanimous in the belief that under Article III, Section 14 of the West Virginia Constitution, the right to a jury trial is accorded in both felonies and misdemeanors where the penalty imposed involves any period of incarceration. We recognize that *Bloom's* empirical survey of the right to a trial by jury in colonial times reaches a different result as to petty offenses. However, we cannot ignore our own historical roots, which are embedded in such clear and unequivocal constitutional, statutory and judicial language.[7]

In reaching this conclusion as to the scope of the mandate of Article III, Section 14, we are aware of its proviso that: "Trials of crimes, and misdemeanors, *unless herein otherwise provided*, shall be by a jury of twelve

---

"Now, as I understand, this last provision is nothing but a clear and distinct announcement of the meaning of the phrase, 'the right of trial by jury shall remain inviolate,' when applied to criminal cases. And its meaning is precisely the same as that of our Constitution, that 'the trial of crimes and misdemeanors shall be by jury.' They all simply mean that the Legislature shall pass no law whereby, 'in the trial of criminal cases, a jury shall be dispensed with.' ..." [Green, J., 31 W.Va. at 215, 6 S.E.2d at 456]

The equal division by the Court in *Cottrill* on the constitutionality of the waiver statute was resolved in *State v. Griggs*, 34 W.Va. 78, 11 S.E. 740 (1890), where the Court unanimously concluded that the statute was constitutional. The United States Supreme Court has held from a constitutional standpoint that a defendant can knowingly and intelligently waive his right to a jury trial with the consent of the court and the prosecution. *Singer v. United States*, 380 U.S. 24, 13 L. Ed. 2d 630, 85 S.Ct. 783 (1965).

[7] We recognized in *Markey v. Wachtel*, ___ W.Va. ___, ___ S.E.2d ___ (1979) (No. 14504), that the right to a jury trial under Article III, Section 10, providing that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers," does not extend the right of jury trial to an involuntary civil commitment of a person to a mental health facility. In *Markey*, we traced the historical background of Article III, Section 10, and concluded that it was not designed to provide a blanket right to jury trial in all civil cases. *Markey* did not discuss Article III, Section 14, which is obviously designed to apply to criminal proceedings.

men. . . ." [Emphasis added]. This proviso obviously refers to other provisions in the Constitution which might limit the right to a trial by jury. There are certain provisions in our Constitution containing some limitations, but none of these abolish the right to have a trial by a jury in either a felony or misdemeanor case.[8]

Our research discloses that our constitutional language, "[t]rials of crimes, *and misdemeanors*," [emphasis added] is unique in its specificity.[9] Most state constitutions utilize the phrase "in all criminal prosecutions," which parallels the language of the Sixth Amendment to the United States Constitution. In seven states, courts have concluded that the language "in all criminal prosecutions" requires the right to a jury trial on any criminal offense which may result in incarceration.[10] Two of

---

[8] Article III, Section 13 provides: "In suits at common law . . . in a court of limited jurisdiction a jury shall consist of six persons." Article III, Section 9 provides that in eminent domain cases "compensation shall be ascertained by an impartial jury of twelve freeholders." Article III, Section 21, ratified November 6, 1956, provides: "Regardless of sex, all persons, who are otherwise qualified, shall be eligible to serve as petit jurors, in both civil and criminal cases. . . ." Under Article VIII, Section 10, ratified November 5, 1974, the following provision is found: "In a trial by jury in a magistrate court, the jury shall consist of six jurors who are qualified as prescribed by law."

[9] Much the same point was made by the Court in *State v. Cottrill*, 31 W.Va. 162, 6 S.E. 428 (1888).

[10] *Baker v. City of Fairbanks*, 471 P.2d 386 (Alaska (1970) (jury trial for any offense that involves a possibility of incarceration or loss of valuable license); *State v. Sklar*, 317 A.2d 160 (Me. 1974) (jury trial for every prosecution which is criminal, regardless of it being "petty" or "serious"); *Cahill v. Fifteenth District Judge*, 70 Mich. App. 1, 245 N.W.2d 381 (1976) (jury trial whenever defendant may receive a jail sentence); *Peterson v. Peterson*, 278 Minn. 275, 153 N.W.2d 825 (1967) (jury trial for all criminal prosecutions "regardless of gravity;" excluding municipal ordinances as "not against the state;" applied to include jury trial for criminal contempt which by statute is punishable by up to six months and $250); *Franklin v. State*, 576 S.W.2d 621 (Tex. Crim. App. 1978) (right of jury trial applies equally to felonies and misdemeanors); *State v. Becker*, 130 Vt. 153, 287 A.2d 580 (1972) (jury trial for all criminal offenses even if maximum penalty involves no incarceration and only $50 fine); *State ex rel. Murphy v. Voss*, 34 Wis.2d 501, 149 N.W.2d 595 (1967) (jury trial right extends to all misdemeanors).

these states have applied the right to a jury trial to any criminal contempt. *State v. Browder,* 486 P.2d 925 (Alaska 1971); *Peterson v. Peterson, supra,* but this issue appears not to have been decided in the other five states.[11]

We are not unmindful that W. Va. Code, 61-5-26,[12] establishes a provision on contempt which implies that the court, for a direct contempt committed in its presence, can without jury impose a maximum fine of $50 and ten days in jail. The statute is silent as to the right to a jury in the other categories of contempt.

This Court has not had occasion to consider the constitutionality of W. Va. Code, 61-5-26, in a criminal contempt proceeding as against a claim that it violates the right to a trial by jury under Article III, Section 14. We

_____

[11] R. Goldfarb in *The Contempt Power* (1963), at 183, discussed the constitutional aspects of a criminal contempt proceeding:

"The constitutional policies are clear. Criminal contempt should be tried as other crimes are—with all procedural guarantees protecting the accused. There should be the right to a jury trial of the charged contempt. The confusion wrought from vague and misleading distinctions between civil and criminal contempts, and the stronger policies of protecting individual liberty, underscore this logical conclusion."

[12] "The courts and the judges thereof may issue attachment for contempt and punish them summarily only in the following cases: (a) Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice; (b) violence or threats of violence to a judge or officer of the court, or to a juror, witness, or party going to, attending or returning from the court, for or in respect of any act or proceeding had, or to be had, in such court; (c) misbehavior of an officer of the court, in his official character; (d) disobedience to or resistance of any officer of the court, juror, witness, or other person, to any lawful process, judgment, decree or order of the said court. No court shall, without a jury, for any such contempt as is mentioned in subdivision (a) of this section, impose a fine exceeding fifty dollars, or imprison more than ten days. But in any such case the court may impanel a jury (without an indictment or any formal pleading) to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict. No court shall impose a fine for contempt, unless the defendant be present in court, or shall have been served with a rule of the court to show cause, on some certain day, and shall have failed to appear and show cause."

stated in *Hallam v. Alpha Coal Corporation*, 122 W.Va. 454, 459, 9 S.E.2d 818, 821 (1940), that:

> "[This] section which, by its language, conferred upon the courts jurisdiction to punish summarily the listed instances of contempt, including misbehavior of an officer of the court in his official character, ... expressly excludes proceeding summarily in all other cases. ..."

Moreover, in discussing this statute in *State ex rel. Arnold v. Conley*, 151 W.Va. 584, 588, 153 S.E.2d 681, (1966), we stated:

> "In *State ex rel. McNinch v. Porter*, 105 W.Va. 441, pt. 2 syl., 143 S.E. 93, it was held that, notwithstanding the common law right of courts to punish for contempt, a circuit court may not proceed and punish summarily for acts other than those enumerated in the statute. To the same effect, see *State v. Hansford*, 43 W.Va. 773, pt. 1 syl., 28 S.E. 791."

It is, therefore, apparent that we have viewed this statute as a restriction on the contempt powers of a court. However, the ultimate question of the right to a jury trial in a criminal contempt proceeding must be answered by the constitutional command which, as we have seen, mandates a jury trial in a criminal contempt where a jail sentence may be imposed without the right of immediate release by purging oneself. To the extent that the statute conflicts with this constitutional mandate, it must yield.

It should again be emphasized that our holding is narrow and only to the effect that Article III, Section 14 of the West Virginia Constitution prohibits imprisonment without a jury trial in a criminal contempt proceeding where the contemnor is sentenced and the sentencing order does not provide him an opportunity to purge the contempt.[13] It is not applicable where the

---

[13] Since the issue has not been raised, we do not determine whether Article III, Section 14 of our Constitution requires a jury trial on a criminal charge where only a fine is involved. The United

sentencing order contains the condition that the contemnor can gain immediate release by purging himself of the contempt by performing an act that is within his power to accomplish.[14]

We recognize the argument that by requiring a jury trial in criminal contempt cases involving jail sentences, we would be depriving trial courts of an effective means of keeping order in the courtroom or ensuring that their orders are obeyed. Obedience to court orders can still be effectuated, where parties have been contumacious, through a civil contempt proceeding which includes conditional imprisonment; that is, imprisonment based on the condition that the contemnor will be freed on agreeing to honor the court order and perform such act to comply with the order as is reasonable within his power to do. A court may also summarily expel a disruptive party or spectator from the courtroom.[15]

---

States Supreme Court has not interpreted the Sixth Amendment to require the right to a jury trial in a criminal proceeding involving a fine. *Muniz v. Hoffman*, 422 U.S. 454, 45 L. Ed. 2d 319, 95 S.Ct. 2178 (1975); *District of Columbia v. Clawans*, 300 U.S. 617, 81 L. Ed. 843, 57 S.Ct. 660 (1937). It has, however, held that a criminal fine cannot, in the case of an indigent defendant, be converted into a jail term because of his inability to pay the fine. *Tate v. Short*, 401 U.S. 395, 28 L. Ed. 2d 130, 91 S.Ct. 668 (1971).

[14] An obvious example would be where a party is required by court order to pay alimony and support and contumaciously refuses to make payments. The court could order his commitment without the necessity of a jury trial if the order provided for immediate release upon his agreeing to make the payments. *State ex rel. Trembly v. Whiston*, ___ W.Va. ___, 220 S.E.2d 690 (1975).

[15] *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L. Ed. 2d 353, 359 (1970), permits expelling a criminal defendant and suggests as a last resort that he be bound and gagged. It has been recognized that the contempt power may have little effect on a truly disruptive defendant, as noted by Chief Justice Burger in his concurring opinion in *Mayberry v. Pennsylvania*, 400 U.S. 455, 467, 91 S.Ct. 499, 506, 27 L. Ed. 2d 532, 541 (1971):

"The contempt power, however, is of limited utility in dealing with an incorrigible, a cunning psychopath, or an accused bent on frustrating the particular trial or undermining the processes of justice. For such as these, summary removal from the courtroom is the really effective remedy."

Finally, the court's power to punish for criminal contempt by fine or imprisonment is in no way diminished by today's opinion. Such power has only been made subject to the procedural safeguard of a jury as constitutionally commanded for any crime where incarceration is contemplated.

In view of this range of retributive rights, we can hardly conceive that the trial courts are powerless to control the parties or the conduct of the proceeding before them.

Appellant raises several evidentiary questions. However, because a new trial must be granted because of the failure to accord a jury, we decline to discuss them.

For the foregoing reasons, the appellant's conviction for criminal contempt is reversed and a new trial awarded.

*Reversed and remanded.*

NEELY, CHIEF JUSTICE, *dissenting:*

The choice between order and liberty is always difficult and never permanent, *Eastern Associated Coal Corp. v. Doe,* ___ W.Va. ___, 220 S.E.2d 672, 680 (1975). Today's choice to require jury trials in contempt proceedings is prompted by the same optimism which through successive generations has brought the world from slavery to individual freedom; however, today's decision is in no way dictated by the law. The choice is a legitimate one of policy, which of course is the fountainhead of all law, but I reluctantly conclude that the policy is unwise. As we enter the decade of the 1980's and world-wide population continues to push against fixed resources, while the post World War II international order crumbles around us leaving the withered leaves of industrial enterprise lying on every side with the means of exchange frozen in the currents of trade, there will ensue an even more militant struggle to preserve income shares. Since a continued incompetence on the part of political institutions can reasonably be foreseen,

the demands in the next decade upon the one remaining force of order, namely the courts, shall become ever more urgent.

Mankind is an evolutionary aberration; he has come from savage beast hunting in the primeval forests to master of atomic energy in 2000 years, a long time in terms of human lives but the mere twinkling of an eye in terms of evolution. Each individual man contains the potential both for surpassing love and self-sacrifice as well as destruction and chaos. Notwithstanding that the forces of order are also the forces of tyranny, without order man becomes a beast. Whether man is viewed as a fallen angel as he was in the 14th Century when summary proceedings for contempt began, or whether he is perceived under the 20th Century view as a risen ape, the need for an ordered society remains.

The inevitable course of history will ultimately point out the folly of today's ruling; consequently, the purpose of this dissent is to analyze the law which is available to reverse the majority's policy when it finally becomes evident that jury trials for contempt will destroy the authority of courts. When the lower courts and those seeking enforcement of their orders conclude that the ancient procedure will again be acceptable to this Court, they may raise the issue by bringing an action in prohibition to prohibit the lower court from empaneling a jury, *State ex rel. Hinkle v. Black*, ____ W.Va. ____, ____ S.E.2d ____ (1979).

I respectfully dissent from the majority's decision that a judge is not empowered to punish for contempt without the intervention of a jury. The majority states that the United States Supreme Court in *Bloom v. Illinois*, 391 U.S. 194 (1968) found a lack of substantial common law precedent for summary proceedings in contempt. While the majority included the part of footnote 2 in *Bloom* which recites the historical analysis relevant to their argument, they omitted the preceding part of that footnote in which Blackstone's *Commentaries on the Laws of England* is cited for the proposition that:

> The process of attachment for these and the like contempts must necessarily be as ancient as the laws themselves; for laws without a competent authority to secure their administration from disobedience and contempt would be vain and nugatory. A power, therefore, in the supreme courts of justice, to supress such contempts by an immediate attachment of the offender results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. [*Bloom v. Illinois*, 391 U.S. 194, 198 n.2 (1968).]

The Court later commented in that same footnote:

> Of course, 'Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. . . . [U]ndoubtedly the framers of the Constitution were familiar with it. *Schick v. United States*, 195 U.S. 65, 69 (1904)." [*Id.* at 199 n.2.]

The history behind the doctrine that by "immemorial usage" all contempts could be tried summarily is indeed ambiguous; however, the adherence to that doctrine in American jurisprudence had been consistent up to the *Bloom* decision. This adherence is probably best exemplified by contrasting Justice Felix Frankfurter's academic attack upon the historical basis of the "immemorial usage" doctrine when he was a Harvard Law School Professor in Frankfurter & Landis, "Power of Congress over Procedure in Criminal Contempts in 'Inferior' Federal Courts - A Study in Separation of Powers," 37 *Harv. L. Rev.* 1010, 1042-1052 (1924), with the deciding vote he subsequently cast as a Supreme Court justice in *Green v. United States*, 356 U.S. 165 (1958) which upheld summary proceedings in contempt.

In his concurrence in *Green* Justice Frankfurter wrote: "[t]he fact that scholarship has shown that historical assumptions regarding the procedure for punishment of contempt of court were ill-founded, hardly wipes out a century and a half of the legislative and judicial history of federal law based on such assumptions." *Id.* at 189. Frankfurter's final justification for upholding the

doctrine was that it was the legislature's province to extend the participation of the jury and not the Court's. He pointed to a long list of Supreme Court justices and to two score cases which established an "unbroken legislative and judicial history from the foundation of the Nation." *Id.* at 193. Our Court, by this reasoning certainly, has overstepped its bounds in determining what has already been decided by the legislative branch, by impliedly striking down our State statute, *W.Va. Code*, 61-5-26 [1923] empowering a judge summarily to punish contempt committed in the face of the Court.

Whatever doubts there may be about the historical origins of the power to punish constructive contempt, there is no comparable confusion regarding any contempt committed in the face of the Court (in *facie curiae*). As Justice Frankfurter observed, "[t]he most authoritative student of the history of contempt of court has shown that 'from the reign of Edward I it was established that the Court had power to punish summarily contempt committed * * * in the actual view of the Court.' Fox, *History of Contempt of Court*, 49-52." *Green, supra* at 189. Fox was the same legal historian who wrote of the historical error in the origins of indirect contempt in his articles in the 1920's in which he concluded, "in the common law contempt not committed in the face of the Court was unknown." Fox, "Eccentricities of the Law of Contempt of Court", 36 *L. Q. Rev.* 394, 398 (1920). Regardless of any historical error resulting in the development of summary proceedings for the trial of contempt cases, even these justices who have urged that contemnors are constitutionally entitled to trial by jury have recognized the necessity for an exception for contempts in *facie curiae*. *Sacher v. United States*, 343 U.S. 1 (1952), (Black, J., dissenting), *Green v. United States*, 356 U.S. 165 (1958), (Black, J., dissenting). In this regard I should point out that the majority opinion has passed on jury trials for contempts in the face of the court only by way of dicta, since the case before us concerns an indirect contempt. Consequently, I urge the lower courts to require this Court to face the issue of whether the

vain act of a jury trial for contempts in the face of the court should be mandated by continued summary punishment of them until such time as this Court is confronted with a case of summary punishment through which it can examine this area of the law.

While the historical error in the origins of the power to punish summarily for constructive contempt was not sufficient to persuade Justice Frankfurter to restrict this power, our Court finds such error so egregious that the power to punish summarily for any contempt must be abolished. It is true that during the medieval period the courts were not empowered to punish summarily for contempt committed out of the presence of the court; however, "at the beginning of the seventeenth century, the judges were taking upon themselves to punish summarily offenses which in the Middle Ages would have been remedied by an indictment . . . (and) [i]n the middle of the seventeenth century they were exercising this jurisdiction in the case of contempts committed out of court." 3 W. Holdsworth, *A History of English Law* 394 (2nd imp. 1973).

There is no question that our parent state of Virginia has always considered the power to punish summarily to be an inherent part of the judicial system. In *The Commonwealth v. Dandridge*, 4 Va. (2 *Va. Cas.*) 408 (1824) the Virginia Supreme Court of Appeals addressed the extent of the contempt power and concluded that under the English authorities the courts were empowered to punish summarily for both direct and indirect contempt. In a separate opinion Judge White noted that the power was "an inseparable attendant upon every superior tribunal," *id.* at 436, but that the legislature would be the proper tribunal to limit the contempt power of the courts. The Virginia legislature subsequently defined contempt and limited the power of the courts to punish summarily. That statute was adopted almost *in toto* by our state.[1]

---

[1] A comparison of the relevant statutory sections reveals that our statute is nearly identical to the statute passed by the Virginia Assembly in 1834. The only significant difference is that Virginia's

This statute was held constitutional in *Commonwealth v. Deskins* 31 Va. (4 Leigh) 685 (1834). The inherent power of the courts to punish summarily for contempt has been consistently upheld in Virginia. *Holt v. Commonwealth*, 205 Va. 332, 136 S.E.2d 809 (1964), *rev'd on other*

---

provision covering contemptuous language, *Va. Code*, §18.2-456(3) [1975], is omitted from our statute. The Virginia *Code* provision is as follows:

The courts and judges may issue attachments for contempt, and punish them summarily, only in the cases following:

(1) Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice;

(2) Violence, or threats of violence, to a judge or officer of the court, or to a juror, witness or party going to, attending or returning from the court, for or in respect of any act or proceeding had or to be had in such court;

(3) Vile, contemptuous or insulting language addressed to or published of a judge for or in respect of any act or proceeding had, or to be had, in such court, or like language used in his presence and intended for his hearing for or in respect of such act or proceeding;

(4) Misbehavior of an officer of the court in his official character;

(5) Disobedience or resistance of an officer of the court, juror, witness or other person to any lawful process, judgment, decree or order of the court. *Va. Code*, §18.2-456 [1975].

A judge of a district court shall have the same power and jurisdiction as a judge of a circuit court to punish summarily for contempt, but in no case shall the fine exceed fifty dollars, or the imprisonment exceed ten days, for the same contempt. *Va. Code*, §18.2-458 [1975].

In West Virginia the *Code* language is as follows:

The courts and the judges thereof may issue attachment for contempt and punish them summarily only in the following cases: (a) Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice; (b) violence or threats of violence to a judge or officer of the court, or to a juror, witness, or party going to, attending or returning from the court, for or in respect of any act or preceeding had, or to be had, in such court; (c) misbehavior of an officer of the court, in his official character; (d) disobedience to or resistance of any officer of the court, juror, witness, or other person, to any lawful process, judgment, decree or order of the said court. No court shall, without a jury, for any such contempt as is mentioned in subdivision (a) of this section, impose a fine exceeding fifty dollars, or imprison more than ten days. But in any such case the court may impanel a jury (without an

*grounds sub nom. Holt v. Virginia,* 381 U.S. 131 (1965); *Carter v. Commonwealth,* 96 Va. 791, 32 S.E. 780 (1899).

The majority overlooked the Virginia contempt statute which was substantially adopted by our state and instead focused on our unique Constitutional language requiring a jury trial in the "trials of crimes, and misdemeanors." *W. Va. Const.* Art. III, §14. The majority maintains that the specificity of that language somehow changes the scope of that provision in opposition to similar language in other state Constitutions. Admittedly our language is different from any other state, but there is no suggestion that this language was intended to abolish the statutory right to punish summarily for contempt. A review of the debates during the first Constitutional convention reveals no discussion of this particular provision in the Bill of Rights. Instead it seems more likely that our unique language may be attributed to a desire to avoid confusing language. One commentator suggests that the delegates consciously chose straightforward language and labored to avoid such "hackneyed and confusing expressions as 'all men are by nature equally free.'" 1 *Debates and Proceedings of the First Constitutional Convention of West Virginia* 39 (Introduction). In substance there is very little difference between the protection afforded by the Virginia *Constitution* and the protection afforded by the West Virginia *Constitution.*[2]

---

indictment or any formal pleading) to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict. No court shall impose a fine for contempt, unless the defendant be present in court, or shall have been served with a rule of the court to show cause on some certain day, and shall have failed to appear and show cause. *W. Va. Code,* §61-5-26 [1923].

[2] The applicable constitutional provisions are:

*West Virginia*

The trial of crimes and misdemeanors, unless herein otherwise provided, shall be by jury, and shall be held publicly and without unreasonable delay, in the county where the alleged offence was committed, unless upon petition of the accused and for good cause shown, or in consequence of the existence of war or insurrection in such county, it is removed to, or instituted

Our Court first focused on our unique provision insuring a jury trial when it was discovered that the provision could be used to make a jury trial mandatory in all cases. After twenty-five years of allowing the defendant to waive a right to a jury in a misdemeanor the court was presented with the argument that the provision for jury trials contains the word "shall" (see footnote 2) so that jury trials would be commanded. An evenly divided court allowed the defendant to continue waiving a jury in misdemeanors. *State v. Cottrill*, 31 W. Va. 162, 6 S.E. 428 (1888). If that court had read the provision literally, a jury trial would have been required for even the most minor offense. A majority of that court did not read the language completely literally because two members realized that the statute allowing juries to be waived, *W. Va. Code*, Ch. 116-29 [1887], was passed contemporaneously with the *Constitution* and thus it would be wrong to assume that the framers of the West Virginia *Constitution* required juries in every single criminal prosecution.

*Cottrill* is heavily relied upon by our majority to show that all the judges in that case were in fundamental agreement that a jury trial is required in all cases. The majority includes portions of those four justices' opinions in a footnote to buttress their argument that a jury trial must be granted in criminal contempt proceedings. It would seem that a decision four years earlier by the very same members cited in the majority's footnote on

---

in, some other county. In all such trials the accused shall be informed of the character and cause of the accusation, and be confronted with the witnesses against him, and shall have the assistance of counsel for his defense, and compulsory process for obtaining witnesses in his favor. *W. Va. Const.*, Art. III, §14.

*Virginia*

That in all capital or criminal prosecutions, a man hath a right to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, to call for evidence in his favor, and to a speedy trial by an impartial jury of twelve men of his vicinage, without whose unanimous consent he cannot be found guilty; nor can he be compelled to give evidence against himself; that no man be deprived of his liberty, except by the law of the land or the judgment of his peers. *Va. Const.*, Art. I, §8.

the issue of the right to a jury trial in contempt proceedings should also be of value. That court unanimously upheld the right of the Supreme Court to punish both direct and indirect contempt summarily and the right of lower courts to punish contempt summarily as limited by statutory provisions. *State v. Frew & Hart*, 24 W. Va. 416 (1884).[3]

In addition to relying on *Cottrill, supra*, as precedent in this jurisdiction for the principle that a defendant in criminal contempt proceedings has the right to a trial by jury, the majority also seems to rely upon the principle expressed in *State ex rel. Arnold v. Conley*, 151 W.Va. 584, 153 S.E.2d 681 (1966), that criminal contempt proceedings are to be treated as criminal in nature from a procedural standpoint. The majority neglected to include the principle immediately following in that opinion, namely, "[w]hile this court has held in many cases that a trial for criminal contempt 'is a proceeding in the

---

[3] In *State v. Frew & Hart*, three of the four members wrote separately and their statements provide an interesting contrast to the statements gleaned from *Cottrill* by the majority.

At common-law, as clearly appears in *Dandridge's Case*, the power to punish for such constructive contempts was as much an inherent because a necessary power, as to punish for direct contempts; and as we have seen, this position is abundantly sustained by authority. (Johnson, J., 24 W.Va. at 455).

... it may be stated as a proposition of law unquestioned and unquestionable, that by the common-law of England as well as by the uniform discussions of this country, courts have the inherent power to punish for contempts in a summary manner, and that his power is an essential element and part of the court itself which cannot be taken away without impairing the usefulness of the court, because it is a power necessary to the exercise of all others. This much has never been disputed. . . .

. . .Apart from any statutory enactment, I regard it as the settled law of Virginia and this state, fully established by the able opinions and the general court of Virginia in *Dandridge's Case*, 2 *Va. Cas.* 408, that the courts of these states possess the power to punish, in a summary manner, both *direct* and *constructive* contempts. The right to do so in cases of the first class no one denies. (Snyder, J., 24 W. Va. at 473).

[T]he members of this court are well agreed as to the law applicable in this case. (Green, J., 24 at 480).

nature of a criminal trial,' or 'a quasi criminal proceeding,' it has never held that a contempt proceeding is actually a criminal trial." 151 W. Va. at 587, 153 S.E.2d at 683 (1966).

The majority's legal support in the case before us for abolishing the power to punish summarily for contempt consisted of: the expansion of a suggestion in *Bloom* that the doctrine allowing summary proceedings for constructive contempt was predicated on an historical error in the common law—an error which did not apply to direct contempt and an error which moved the U.S. Supreme Court to restrict summary confinement to a six month limit while our statute, *W.Va. Code*, 61-5-26 [1923] has a limit of ten days; the argument that the West Virginia *Constitution's* clause is unique in its application despite the fact that Virginia's right to a jury trial contains substantially the same ideas and despite the fact that our statute limiting the power to punish for contempt is virtually the same as our parent state of Virginia; and, the argument that West Virginia jurisprudence has always accorded a jury trial despite the fact that the right to a jury trial has been treated as inapplicable to contempt proceedings consistently in Virginia and West Virginia jurisprudence until today's decision rewrote the law.

I now must turn to the only other area of legal justification offered by the majority, namely our sister states. The majority suggests that seven states have similarly required jury trials in contempt proceedings, although they do admit that only two have required jury trials in all criminal contempt proceedings. But even that modest assertion is incorrect. Minnesota has not applied the right to a jury to any criminal contempt, and in the very case cited by the majority, the Minnesota Supreme Court specifically limited their decision to cases of indirect contempt and failed to find that the defendant was entitled to a jury as a matter of constitutional right even in indirect contempt cases. *Peterson v. Peterson*, 278 Minn. 275, 153 N.W.2d 825 (1967). The single state

that has formed a constitutional right to a jury trial in all criminal contempt proceedings is Alaska. In reaching this singular conclusion, however, the Alaska Supreme Court was much more honest in protraying the nature of their novel precedent than our own Court. Rejecting any attempt to find legal support for their decision, the Alaska Supreme Court frankly stated, "[i]n reaching this construction, we expressly [hold] that contemporary social values, rather than historical categorizations, should determine whether a prosecution is criminal for purposes of the right to jury trial." *State v. Browder*, 486 P.2d 925, 936 (Alaska 1971).

Having finally unmasked the majority opinion as a pure policy decision based on "contemporary social values" rather than historical precedent we must now consider whether this is indeed a valid policy. Unfortunately the majority was so concerned with creating the legal justification for the reversal of law that has been accepted since at least the 17th Century that they neglected to include the policy reasons that directed the result. The importance of the right to a fair trial cannot be overemphasized, but the judiciary must be possessed of sufficient power to insure the effective administration of the judicial system in the protection of individual rights. On an abstract level, it would seem easy to provide a jury trial in direct contempt cases. Upon closer examination, however, the actual trial process would require cross-examination of the judge-witness, testimony by other lawyers against a fellow lawyer, and the need to recreate the contemptuous act. To require a judge to endure a proceeding of this type would restrict his power and his inclination to use his contempt power. Without that power, the judge would be at the mercy of the disorderly who want to disrupt the judicial process. It is a well known tactic by litigators who practice before administrative tribunals, when saddled with a sure loser, as a last resort to bait the tribunal to see if something would be said which would cause a reversal. The reason that the power to punish for direct contempt has been indispensable for centuries is not that judges are

inordinately sensitive or overly conscious of personal security, but that it "is a safeguard not for judges as persons but for the function which they exercise." *Pennekamp v. Florida*, 328 U.S. 331, 366 (1946).

Stripped of the power to punish summarily for contempt, a judge becomes dependent upon the popular will of the jury in preserving order in the courtroom and enforcing orders outside the courtroom. As a general rule, reliance upon the jury would not upset a legitimate finding of contempt by the judge; however, it does not take a great deal of imagination to think of instances when a judge's enforcement of the law would place him in a distinct minority of the populous. Looking back to the days of court ordered integration in the Southern states, it is doubtful that a Southern jury would have upheld a charge of criminal contempt against a fellow Southerner who defied a court order. Looking to the future it is fair to say that the court may once again have to stand alone to vindicate principle, and that they should be left naked, stripped of the power to punish summarily for contempt is poor preparation for the next assault upon the judicial process which we will inevitably face. Again, the contempt power was not conceived in order to vindicate the dignity of a particular judge, but instead to prevent interference with the administration of justice.

This Court went very far in *Eastern Associated Coal Co. v. Doe, supra* in assuring a prompt and orderly procedure for dissolving temporary injunctions and for providing appeals from unlawful injunctions. Furthermore, the Supreme Court of Appeals is ever vigilant for abuses of the contempt power, indeed, there are judges who make asses of themselves in this regard. However, we are always here and have been most responsive to petitions for prohibition in contempt cases in the face of the court. In that lone instance we are the jury. We can both insure against abuses of judicial power and simultaneously provide the forces of order with the necessary power to accomplish necessary social purposes.