AMERICAN BRIDGE DIVISION, U.S. STEEL CORPORATION, Plaintiff-Appellee,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 487, Defendant-Appellant.

No. 84–5789.

United States Court of Appeals, Eleventh Circuit.

Oct. 8, 1985.

Engineers ("Union") under Section 303 of the Labor Management Relations Act, 29 U.S.C. 187, in the United States District Court for the Southern District of Florida. The district court therefore ordered the Union to compensate American Bridge for the damage it sustained as a result of the jurisdictional strike that constituted the illegal act compensable under Section 303. For the reasons explained below, we affirm the district court on the issue of liability; however, we find that the district court significantly overstated the extent of injury sustained by American Bridge and therefore make appropriate modifications as to damages.

## I

American Bridge entered into a contract with Ingall's, Inc., for the erection of the steel framework for the Southeastern Financial Center Building in Miami. In order to perform the contract, American Bridge hired Frank Guerin, Howard Ford, and James Cole from the Union hiring hall on July 6, 1982. These men were hired to operate two large cranes: the 4000W crawler and the Favco 1900.

The Favco 1900 was to be operated at such great heights that a special steel base had to be constructed to support the crane. A dispute arose as to whether the construction work on the base was to be performed by members of the Ironworkers Local 272 or by a composite crew of Ironworkers and Operating Engineers. On July 13, Peter Signorotti, a steward in the Union and an employee of the general contractor Newburg Construction ("Newburg") at the jobsite, inquired as to whether a composite crew was to be used. Signorotti told Ford, "We don't work without a composite crew." Later, on July 15, William Henson, the Union's business agent, advised Vernon Deckard, American Bridge's jobsite superintendent, that the base work should be done by a composite crew. Although the Union disputes the finding, the district

Howard S. Susskind, Kaplan, Sicking & Bloom, P.A., Richard Siwica, Miami, Fla., for defendant-appellant.

Phillip J. Sheehe, Frates, Miami, Fla., Jeffrey E. Beeson, Pittsburgh, Pa., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

PER CURIAM:

The American Bridge Division of the United States Steel Corporation ("American Bridge") prevailed against Local 487 of the International Association of Operating

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

court found on the basis of ample record evidence that Henson accompanied this advice with a threat that a composite crew would perform the work "or else." At about that same time, Guerin refused to unload the Favco 1900 parts, because Guerin had been told there were not enough operators on the jobsite.

On July 19, the dispute intensified. Guerin and Ford again refused to unload the Favco 1900 parts. The district court found on the basis of record evidence that Guerin and Ford had been "told" not to unload the parts. Guerin related these events to Signorotti. Then, Guerin, Ford, and, according to the district court, Cole stopped work; Cole, however, did return to the jobsite on July 20, 21, 22, 23 and 26. Signorotti, having first called Minous Shears, the Union's business manager, to explain the situation, told Guerin and Ford to "sit there" until Henson arrived. Regis Marshall, American Bridge's assistant superintendent, then approached Signorotti in an attempt to discuss the matter with him. Signorotti ignored Marshall and walked over to a signalman's radio. He used the radio to talk to a crane operator for Newburg; shortly, thereafter, that crane operator also stopped work. All Union operators then followed Signorotti off the jobsite. Marshall proceeded to Deckard's office to report a "total shutdown." By that time, Henson had arrived at Deckard's office but merely responded "so what" to the news of the strike. At a meeting later that morning, Shears told Deckard that no more operators would be provided.

On July 20, the Union operators from both American Bridge and Newburg congregated early across the street from the jobsite. Shears, however, told Signorotti to instruct all operators employed by Newburg to return to work, and Signorotti did so. The Newburg operators promptly returned to work. The operators employed by American Bridge remained off the job, however, except for Cole. Meanwhile, Edward Wilson, American Bridge's Manager for Labor Relations, sent telegrams to vari-

ous officials of both the Local and the International Union of Operating Engineers, requesting an end to the strike. Nonetheless, Ford and Guerin performed no work on July 20.

The work stoppage continued on July 21. Henson and Shears visited Deckard's office, requesting arbitration. Deckard replied that it was too late for arbitration. Later that afternoon, Ford returned to work briefly. Once on the site, however, Ford refused to lift the Favco 1900 parts. Marshall therefore terminated him.

On July 22, Guerin reported to the jobsite and stated he was ready to work. Deckard asked him if he would lift the Favco 1900 parts. Guerin replied, "I have to make a phone call first." After making the call, Guerin said that he could not lift the Favco 1900 parts. He then left. Guerin did not return until July 28.

On July 27, Marshall returned to the jobsite after lunch and learned that the compressor was not operating. As he began to restart it, Signorotti said, "I wouldn't do that, you don't have a compressor operator; Cole went home." Later in the day, however, the International President ordered an end to the strike. In response to this mandate, Cole and Guerin returned to work on July 28.

Based on the above facts, the district court found three separate violations for which the Union could be liable under Section 303. First, it found a violation in the walkout by Newburg employees at Signorotti's instance. Second, it found a violation in Henson's use of the threat "or else" when talking to Deckard about the need for a composite crew. Finally, the court found that the walkout by American Bridge employees was illegal.

The district court clearly imputed liability for the third violation to the Union, using both a common law agency theory and a mass action theory. It is also clear that all damages awarded were based on the third act. It is less clear, however, whether any of the damages awarded were also attributed to the first or second violation.[1] In

---

1. As we sustain the district court's finding of liability on the third violation, we need not

reach the issue of possible damages from the other two alleged violations by the Union.

any event, American Bridge was awarded damages in the amount of $41,279.60. This appeal followed.

## II

It is undisputed that the acts of Ford, Guerin and Cole constituted an illegal jurisdictional strike under Section 8(b)(4)(i)(D) of the National Labor Relations Act, 29 U.S.C. Section 158(b)(4)(i)(D). The critical issue is whether the acts of these employees can be imputed to the Union to give rise to union liability under Section 303.

■■■ A union is not generally liable for the unauthorized acts of its members. Therefore, in order to recover from the union treasury under Section 303 for such acts, a plaintiff must show that agents of the union either "participated in, ratified, instigated, encouraged, condoned, or in any way directed the unauthorized strike." *North River Energy Corp. v. United Mine Workers,* 664 F.2d 1184, 1192 (11th Cir. 1981). In order to give rise to liability, the agent's actions need not be within his actual authority. *Id.* Rather, acts must be in the scope of the agent's "general apparent authority" and be done on behalf of the union. *Id.*

■■ The district court's finding of union liability on an agency theory can be sustained on the basis of Signorotti's acts alone. These acts were clearly done on behalf of the Union. Indeed, Signorotti was not even an employee of American Bridge; his contact with Ford, Guerin and Cole was solely the result of his position as steward for the Union.

■■ It is also clear that Signorotti was acting as the Union's agent. Although the Union maintains that a steward such as Signorotti is not an agent for a labor organization, that is simply not the law. Senator Taft, the namesake of the Labor Management Relations Act, himself stated that "... union business agents *or stewards* acting in their capacity as union officers, may make their union guilty of an unfair-labor practice when they engage in conduct made an unfair-labor practice in the bill ..." 93 Cong.Rec. 6859 (1947) (remarks of Sen. Taft) (emphasis added) (quot-

ed in *North River,* 664 F.2d at 1192–93 n. 8). *Accord, Mason-Rust v. Laborers' International Union,* 435 F.2d 939, 943 (8th Cir.1970). Moreover, although a steward may not be a union agent for all purposes, in this case Signorotti was the highest level union worker on the jobsite. The record further reveals that Signorotti had significant responsibilities relative to the work on this jobsite, and this is further evidenced by the fact that Guerin turned to him when labor trouble developed. It is clear that under these circumstances Signorotti, as a union steward, had the general apparent authority to bind the Union vis-a-vis the daily direction of the Union's workforce on this jobsite; the acts he undertook here were squarely within the scope of that agency.

We therefore conclude that the district court ruled correctly in holding that the Union, through its agent Signorotti, had encouraged, condoned, and ratified the acts of Union members Ford, Guerin, and Cole. As this alone is sufficient to impute liability for those members' acts to the Union, we need not consider the acts of other agents or the possible applicability or current vitality of the "mass action" theory. *See Alabama Power Co. v. Local Union No. 1333,* 734 F.2d 1464, 1469–70 (11th Cir.1984).

## III

We now turn to the issue of damages. The court found that American Bridge was damaged by the illegal jurisdictional strike and awarded it all the relief requested. The damages allowed consisted of compensation for the increased labor costs attributable to the strike, including an allocation for overhead and profit, payment for loss of use of rented and owned equipment, the recovery of interest lost because of delays in payment to American Bridge as a result of the strike, as well as reimbursement for rehiring costs, subsequent worker inefficiency, and escalation of labor rates sustained by American Bridge as a consequence of the work stoppage. The Union challenges essentially each element of this damage award.

Damages awarded under Section 303 need not be capable of precise measurement; it is, however, necessary that any amount recovered be a just and reasonable approximation of the actual injury sustained as a result of the illegal strike. *Vulcan Materials Company v. United Steelworkers*, 430 F.2d 446, 457 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971). It is nonetheless imperative that a district court refrain from indulging in conjecture or speculation in awarding damages. *Turnkey Constructors, Inc. v. Cement Masons*, 580 F.2d 798, 800 (5th Cir.1978). Only actual losses incurred as a result of the strike are recoverable. *H.L. Robertson & Associates v. Plumbers Local Union No. 519*, 429 F.2d 520, 522 (5th Cir.1970). With these general principles in mind, we proceed to review the appropriateness of the various items of damages allowed by the district court.

### A. *Increased Labor Costs*

The district court concurred with American Bridge's contention that, as a result of the work stoppage, labor efficiency for all workers was only fifty percent (50%) of normal for the period from July 16 through July 28, 1982. As a result of this finding, the district court ordered the Union to reimburse American Bridge in the amount of $16,158.30, one-half of the total labor cost during the period. The Union argues, first, that the finding of a fifty percent inefficiency rate was error by the district court; second, that American Bridge failed to mitigate its damages in that it did not immediately lay other workers off in response to the operators' work stoppage; and, third, that the hourly rate awarded for the various workers was excessive.

The first two of these arguments plainly lack merit. Although there was conflicting testimony as to the effect of the work stoppage on worker efficiency, the district court found the fifty percent figure appropriate. The record amply supports that finding. As for the argument that American Bridge should have immediately laid off workers in response to the strike, the record shows that this might

have resulted in American Bridge's losing to other construction enterprises skilled workers in short supply. It is therefore apparent that American Bridge acted reasonably. The court below committed no error in this regard.

The Union's third point raises a more serious question. In awarding the damages, the court below included in the hourly labor rate not only the basic wage rate, dues and taxes paid by the employer, and fringe benefits, but also an allocation for overhead and profit. The basic wage rate, dues, taxes, and fringe benefits are proper elements of relief, as they were sustained as a consequence of the strike. However, the $7.31 of the hourly rate attributable to allocations for overhead and profit lacks record support. American Bridge is made whole by an award of the increase in expenses caused by the strike. The record simply does not support the conclusion that American Bridge sustained any additional loss of profit that is not fully compensated by the reimbursement for the additional expenses incurred.

The allocation for overhead costs suffers from a similar frailty. Overhead by its very nature does not fluctuate proportionally with a business's level of production. Although overhead may frequently be allocated for cost accounting purposes, or even, as here, for the purpose of establishing a contract price, this is a mere convenience and not an actual element of the cost incurred. Where, as in this case, the full profit on a project is ultimately received by an enterprise, overhead is covered to the full extent contemplated by the contract. Therefore, an award for overhead absent a showing of lost profit will constitute double recovery. *Sheet Metal Workers v. Atlas Sheet Metal Co.*, 384 F.2d 101, 109–10 (5th Cir.1967).

Accordingly, the award of the district court for increased labor costs must be reduced to take into account that the hourly rate utilized was excessive by $7.31. To accomplish this, we multiply the excess by the total hours figure for the period involved, or 1140.5 hours. That yields a fig-

ure of $8,337.06, which, when reduced by the inefficiency factor of fifty percent, shows that the district court awarded excess damages in the amount of $4,168.53. The award for increased labor costs should therefore be adjusted to $11,989.77 in order to avoid a double recovery.

### B. Loss of Use—Rented Equipment

■ The district court found that American Bridge was denied entirely the use of the 4000W crawler crane it had rented. Although there is some evidence in the record to indicate that the crane was used at least part of the time, the district court chose to believe the testimony that the crane merely lay idle. The court clearly had this prerogative. The court was also clearly justified in finding that the strike necessitated seven days of additional rental of the office trailer. We therefore uphold the award of $3,269 for the loss of use of this rented equipment.[2]

### C. Loss of Use—Owned Equipment

The court below awarded American Bridge $4,141.38 as compensation for its loss of fifty percent (50%) of the use of equipment which it owned. In arriving at this figure, the district court assumed that each item could have been rented at the daily rental rate published in a standard industry equipment guide. Although there was evidence that American Bridge frequently rented idle equipment to other companies, there was no evidence to support the court's assumption that American Bridge could have done so at that time. In view of this failure of proof, the district

court's award of damages was plainly excessive.

■ The guiding principle in establishing Section 303 damages is neither punishment nor speculation; the goal is to reach a just and reasonable approximation of the actual injury suffered. *Vulcan Materials, supra.* It is apparent that American Bridge was harmed to some extent by being deprived of the efficient use of its equipment for seven working days; it is equally apparent that using the *daily* rental rate for that equipment as a guideline grossly overstates the amount of actual loss. A more reasonable means of approximating the loss is to prorate the applicable *monthly* rental rate over the actual time of the deprivation of use. This calculation provides a rough, but more realistic estimate of the actual loss sustained.

We therefore believe that the award with respect to most items of equipment should be adjusted to reflect seven-twenty-seconds ($7/22$) of the applicable monthly rate. Accordingly, the amount awarded is modified to the more reasonable total of $1502.31.[3]

### D. Rehiring Costs

■ The district court found that American Bridge incurred a loss of $1,084.98 when it rehired Ironworkers to replace those laid off during the strike. This award assumes that three hours of the first day on a job, either by a new or laid-off employee, are consumed by orientation. Although the Union challenges this as unreasonable, particularly as to recently

2. The court below arrived at this figure by assuming that both items would typically be used for twenty-two (22) days each month. It further assumed that seven days' use had been made impossible by the work stoppage. It therefore awarded American Bridge seven-twenty-seconds ($7/22$) of the total monthly rent of the two items.

3. The seven-twenty-seconds figure has been arrived at by using the district court's finding of seven days' deprivation out of a business month of twenty-two days. *See* note 2, *supra.* The sole exceptions to this approach are the two vehicles; as to those, we find no record support for any award of damages. Applying these principles yields a damage award as outlined below:

| Number | Item | Rate | Total |
|---|---|---|---|
| 1 | 600 CRM air compressor | 427.95 | 427.95 |
| 3 | 400 AMP welding machines | 69.05 | 207.15 |
| 5 | 600 AMP welding machines | 94.82 | 474.10 |
| 1 | Vehicle, sedan | –0– | –0– |
| 1 | ¾ ton pick-up truck | –0– | –0– |
| 8 | 10 ton hydraulic jacks | 19.01 | 152.08 |
| 1 | 25 ton hydraulic jack | 27.68 | 27.68 |
| 2 | 50 ton hydraulic jacks | 51.86 | 103.72 |
| 4 | 15 HP creeper winches | 173.41 | 693.64 |
| 4 | Pneumatic angle grinders | 45.82 | 183.28 |
| 11 | Pneumatic impact winches | 66.82 | 735.02 |
| | Total prorated value | | 3004.62 |
| | 50% Efficiency Adjustment | | 1502.31 |
| | Total award | | 1502.31 |

Accordingly, the judgment should be altered to reflect the above amount of $1502.31.

laid-off employees, the record supports the three-hour figure.

Some adjustment in the award is necessary, however. First, the court erroneously calculated the rehire expenses on the basis of thirteen rehired workers. The record supports at most eleven; indeed, the latest trial brief of American Bridge prays for these costs only vis-a-vis eleven rehired workers. Moreover, the hourly rate used contains the $7.31 in overhead and profit allocations that we found improper above. *See* IIIA, *supra.*

The appropriate award in this area, assuming three hours of orientation, eleven rehired employees, and an hourly rate of $20.51, is $676.83.[4]

### E. *Ironworker Inefficiency Following Strike*

■ The district court also found that Ironworker efficiency was only fifty percent (50%) of normal for the week after the strike. The record demonstrates that teamwork is an essential attribute of an Ironworker crew working in structural steel construction. It also shows that special training was required because Ironworkers in the Miami area were not experienced in this type of construction. In view of these findings, the district court did not abuse its discretion in awarding damages for this loss.

Several adjustments are required, however. First, as noted above, the record sustains a finding of only eleven Ironworkers the week after the strike. Second, as indicated above in note 4, the appropriate hourly rate for an Ironworker is $20.51 rather than $27.82. In view of these adjustments and the district court's assumption of a forty-hour work-week, the correct amount of the award is $4512.20.[5]

### F. *Escalation Costs*

■ The district court awarded $6,443.54 for escalation costs. The court characterized as escalation costs those costs incurred because the seven-day delay resulted in seven days' wages being paid at some future level rather than the lower

rates prevailing in July of 1982. In its damage award, the court was willing to trace this week of delay on through to November of 1983. It therefore awarded as damages the difference between one week's wages for all workers at July 1982 levels and one week's wages for all workers at November 1983 levels.

On the facts of this case, this award strikes us as the purest sort of speculation. We might well conclude otherwise if the escalation in wages occurred during or immediately after the illegal strike. We might also reach a different result in the case of a less complex project, where tracing the delay of a week, even for a period of months, might be within the court's discretion. This case, however, involves an immensely involved construction contract of significant duration. To trace a delay of one week through some seventeen months is simply not sustainable. The district court erred in holding that American Bridge had proven on this record any nonconjectural damages for escalation in labor costs.

### G. *Lost Interest*

American Bridge argued below that, because the strike delayed American Bridge's progress on its contract, Ingall's, Inc., delayed its payments for work completed. The district court accordingly awarded $2,949.20. In arriving at this figure, the court first determined the worth of the amount of structural steel that should be erected in a seven-day period, or $131,075. Next, it assumed a monthly interest rate of one and one-half percent (1.5%). The court then awarded interest for a forty-five day period, as forty-five days was the normal turnover time on a payment from Ingall's.

■ In so ruling, the court below clearly erred. Interest was awarded for forty-five days when the Union caused only a seven-day delay. The normal turnover time for payment is not the issue; the proper inquiry is how much payment has been delayed by the strike. Therefore, in-

---

4. 3 hours $\times$ ($27.82/hour – $7.31/hour) $\times$ 11 employees = $676.83.

5. 11 Ironworkers $\times$ 40 hours $\times$ $20.51/hour $\times$ 50% efficiency level = $4512.20.

terest for a period of seven days is all that American Bridge can recover. Accordingly, the proper amount of recovery should be $458.76.[6]

## IV

In conclusion, we hold that the district court committed no error in finding liability under Section 303. However, as explained above, we find that the district court's award of damages was excessive in several respects. The judgment of the court below should be modified to provide for a total damage award of $22,408.87.

AFFIRMED AS MODIFIED.