390 S.E.2d 551

**P.G. & H. COAL COMPANY, INC.**

v.

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, etc.**

No. 17516.

Supreme Court of Appeals of West Virginia.

Nov. 23, 1988.

Dissenting Opinion Feb. 28, 1990.

Concurring Opinion March 23, 1990.

James M. Haviland, Webster J. Arceneaux, II, McIntyre, Haviland & Jordan, Grant Crandall, Crandall, Pyles & Crandall, Charleston, for appellants.

George G. Guthrie, Charles L. Woody, Charleston, for appellee.

MILLER, Justice:

The defendants in this proceeding are the International Union (International), District 17 (District), and Local Union No. 2404 (Local) of the United Mine Workers of America (collectively Unions) and twelve individual union members. The defendants were found in civil contempt for the violation of a temporary injunction order issued in the Circuit Court of Kanawha County. They were held jointly and severally liable for a compensatory fine in the amount of $127,446.85, payable to P.G. & H. Coal Company, Inc. (PG & H). The defendants contend (1) that adequate notice was not

given of over thirty alleged acts of contempt, (2) that the jury instructions were erroneous as to the responsibility of the Unions for the actions of its members, (3) that joint and several liability was erroneously imposed on the Unions and the twelve individual members thereof, and (4) that the compensatory damages allegedly sustained by PG & H were not proven to a reasonable certainty.

## I. FACTS

This appeal grows out of a strike authorized by the International at the mining operations of PG & H located in Cabin Creek, Kanawha County, West Virginia. PG & H had been a signatory to the 1981 National Bituminous Coal Wage Agreement, which expired in September, 1984. When PG & H did not sign the 1984 national wage agreement and resumed partial operations in early 1985, a strike was begun and picketing ensued.[1] On February 8, 1985, PG & H filed a complaint in the Circuit Court of Kanawha County against the Unions and twelve officers and members of the local union, alleging that the defendants had engaged in mass picketing, unlawful acts of violence, and other unlawful activities interfering with PG & H's right to conduct business. The complaint sought compensatory damages and injunctive relief.[2]

PG & H continued to experience problems at its mining operations and on April 25, 1985, petitioned the circuit court for a temporary injunction order prohibiting the International, the District, the Local, and twelve named individuals from, among other things: blocking ingress and egress to the company's operation; making, assaulting, or threatening its employees or others seeking to enter their property in order to

---

**1.** The parties use the terms "strike" and "picketing" interchangeably. Some commentators attempt to differentiate between a "strike" and "picketing"; the former has been termed a withdrawal of services and the latter a stationing of persons near the employer's premises or at a related enterprise. H. Perritt, Labor Injunctions § 1.2 (1986); 2 C. Morris, The Developing Labor Law (2d ed. 1983).

**2.** It is recognized that peaceful picketing is lawful and constitutionally authorized. *Thornhill*

*v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *City of Fairmont v. Retail, Wholesale, and Dept. Store Union, AFL–CIO,* 166 W.Va. 1, 283 S.E.2d 589 (1980). As we recognized in *United Maintenance and Mfg. Co., Inc. v. United Steelworkers of Am.,* 157 W.Va. 788, 204 S.E.2d 76 (1974), citing numerous United States Supreme Court cases, picketing that involves violence or mass picketing may be enjoined.

do business; and engaging in mass picketing, limiting the number of pickets to six. The trial court granted a temporary injunction the same day.[3]

Four days later, on April 29, 1985, PG & H filed a petition for a rule to show cause why the defendants should not be found in civil contempt for violation of the temporary injunction order. The petition was accompanied by an affidavit from PG & H's vice president, John S. Griffin. This petition alleged that the defendants had knowingly violated the temporary injunction by engaging in prohibited activities, such as: (1) damaging and destroying company property and the personal property of its employees; (2) obstructing ingress to and egress from the company's mine and related facilities; and, (3) mass picketing in and around the mine entrance and roads leading thereto for the purpose of threatening and discouraging the plaintiff's employees from reporting to work. A rule to show cause was promptly issued and, thereafter, the defendants filed various pretrial motions.

The proceedings were bifurcated as to the issues of liability and damages. The liability aspect of the contempt proceeding began on May 15, 1985. PG & H introduced evidence to demonstrate that picketing in excessive numbers had occurred on some eleven occasions in violation of the temporary injunction, that company property and motor vehicles had been damaged, and that abusive language and isolated personal injuries had been sustained by security guards. At the close of its case, PG & H filed an addendum to its bill of particulars, enumerating the factual details of other alleged contemptuous acts which had been shown at trial, but not alleged in its pleadings. It then moved the court to conform the pleadings to the evidence.

The defendants moved for a directed verdict. The International and District stressed the lack of evidence of its involvement either in the picketing or in any of the incidents shown in the contempt proceedings. These motions for a directed verdict were denied. The individuals and the Unions introduced testimony by union officials as to the steps taken to control the picket line. The circuit court, at the close of all the evidence, directed verdicts against five of the individual defendants for violation of the temporary injunction.

The circuit court left the liability of the Unions and the remaining seven individual defendants to the jury. The court, over objection, instructed the jury in accordance with the company's proffered instructions. The jury returned a verdict with special interrogatories against the Unions and the remaining seven individual defendants on May 24, 1985. The trial court subsequent-

---

**3.** The relevant paragraphs of the April 25, 1985 temporary injunction order are as follows:

"[I]t is hereby ORDERED by the Court that the defendants, and each of them be, and they are hereby enjoined and restrained and inhibited, until further order of this Court, from doing or causing to be done, and from instigating, encouraging, maintaining, aiding, assisting, or abetting any person or persons, in doing any of the following things:

"1. Standing or placing themselves on or about any private road to the plaintiff's mine and related facilities near Wet Branch Hollow, Kanawha County, West Virginia, or in or upon any public road, or highway leading thereto, in such a position or in such a manner as to obstruct, hinder or prevent the free passage of vehicles or persons, or free access to or egress from, the plaintiff's mine and related facilities.

"2. Blocking or obstructing the road or approaches to plaintiff's said premises with vehicles or other obstructions, or in any way, or by any means, hindering, interfering with or preventing trucks, automobiles, other vehicles, or persons traveling on foot or otherwise, from entering or leaving, or passing freely to or from, plaintiff's said properties or premises.

"3. Assaulting, attacking or injuring, or threatening to assault, attack or injure, plaintiff's customers, vendors or employees, or any other person seeking to enter or exit plaintiff's premises or do business with the plaintiff.

"4. Damaging any vehicle or property of the plaintiff, plaintiff's employees, or persons doing business, or seeking to do business, with the plaintiff.

"5. Picketing, patrolling, congregating, or loitering, about any highway, or other access to plaintiff's properties, or any gates, entrances, driveways, or approaches thereto, in numbers greater than six at a time at any such gate, entrance, driveway or approach thereto.

"6. Doing any other unlawful act of any kind to interfere with or prevent the plaintiff from conducting their business in a lawful manner."

ly denied the defendants' post-verdict motions and entered a broadened injunction order on June 4, 1985.

On June 7, 1985, a hearing on the damage issue was held before the circuit court. Based on the evidence introduced by PG & H, the trial court awarded damages as follows: (1) vandalism and related damages–$6,709.46; (2) financial damage to PG & H's business (lost contribution to fixed cost)–$59,157.05; (3) security costs–$30,748.34; and (4) attorney's fees and litigation costs–$30,832.00.

On July 15, 1985, the circuit court entered a final judgment order holding the defendants jointly and severally liable for the compensatory fine. This appeal followed.

## II. NOTICE OF CONTEMPT CHARGES

The threshold issue in this proceeding concerns the adequacy of the notice given the defendants. The affidavit by the vice president of PG & H alleged that beginning on the evening of April 25, 1985, the date when the temporary injunction order was issued, and continuing until April 29, 1985, certain named and unnamed individual defendants in the civil action had violated the injunction by committing the following acts:

"a. Discharging, on at least three occasions, a weapon thought to be a small caliber rifle which, on one such occasion, destroyed a large halogen light around the watchman's trailer;

"b. Bombardment of said watchman's trailer, company vehicles, and personal vehicles owned by plaintiff's employees, with steel balls propelled from slingshots, and rocks of varying sizes. Certain of plaintiff's employees have had

their personal vehicles substantially damaged as a result of this conduct and have expressed to me their extreme concern for their own personal safety and that of their families.

"c. Picketing in numbers far in excess of six in and around the mine entrance and along the access roads thereto;

"d. Using mirrors to blind plaintiff's employees traveling to and from the mine site while on the roadways leading thereto;

"e. Placing 'jack rocks' and related items in and around the roadways leading to and from plaintiff's mine, as a result of which several tires have been punctured and otherwise damaged;

"e. [sic] Propelling smoke bombs at the watchman's trailer;

"f. Chaining the gate leading to the plaintiff's mine and related facilities shut under circumstances requiring the plaintiff to cut the chain off of its gate with a torch prior to gaining access to its own property; and

"g. Engaging in certain other conduct related to the foregoing, the details of which are not set forth herein." [4]

On May 9, 1985, six days before the liability phase of the proceeding commenced, PG & H submitted a summary of the incidents about which it intended to introduce evidence at trial. This summary provided some specifics concerning the charge of mass picketing and the acts of violence to company-owned and employee-owned property. Some names and dates were given, and the paragraphs of the temporary injunction allegedly violated were identified.

"Upon information and belief, I further state that, as a result of the continuation of defendants' unlawful conduct and violation of the Temporary Restraining Order recently issued by this Court, that P. G. & H. Coal Company, Inc. has suffered damages, as the same can be calculated in monetary terms, in excess of $10,000.00 and will continue to suffer damages in an amount in excess of $10,000.00 for each day said conduct continues."

---

4. The concluding portion of the vice president's affidavit stated:

"Certain individuals who are named defendants herein have been observed engaging in some or all of the above-described conduct, including Elvin B. Mullins and Bernard D. Stull; and it is believed that the majority of persons engaging in such activity are members, and thus agents of, defendants' International Union, United Mine Workers of America; District 17, United Mine Workers of America; and Local Union No. 2404.

PG & H, in response to the defendants' request for a bill of particulars, filed an affidavit by its vice president which appears to be based on information and belief, rather than personal knowledge. It charged the individual defendants with eight new incidents occurring between April 25 and April 29, 1985. It also charged that five violations of the temporary injunction had occurred after the petition for contempt was filed on April 29, 1985. At trial, PG & H introduced evidence of some forty-five violations of the temporary injunction, thirty-two of which occurred after the contempt petition was filed, and the show cause order was issued.[5]

The defendants rely heavily on *State ex rel. United Mine Workers of Am. v. Maynard*, 176 W.Va. 131, 133–134 n. 2, 342 S.E.2d 96, 98–99 n. 2 (1985), also a contempt proceeding, where we stated:

> "The motion or affidavit for contempt filed by the respondent employers ... listed only February 12, 1985, as the date the UMWA violated the court's order. Despite the fact that the UMWA was given notice of only this one day of violation, it is clear from the court's subsequent order that all of the violations for which the UMWA was charged occurred after February 12, 1985, with the first day of violation occurring on February 18, 1985.
>
> "This Court has consistently held that in any contempt case, whether it be civil or criminal, the parties charged with contempt must be given notice of the particular acts that allegedly were in violation of a court's order. *In re Yoho*, 171 W.Va. 625, 630, 301 S.E.2d 581, 586 (1983); *State ex rel. Koppers Co. v. International Union of Oil, Chemical & Atomic Workers*, 171 W.Va. 290, 292, 298 S.E.2d 827, 829 (1982); Syllabus, *Doctors Memorial Hospital, Inc. v.*

*Woodruff*, 165 W.Va. 324, 267 S.E.2d 620 (1980); Syllabus Point 2, *State ex rel. Hoosier Eng'g Co. v. Thornton*, 137 W.Va. 230, 72 S.E.2d 203 (1952). Since the UMWA was only given notice of a violation occurring on February 12, 1985, it should only have been tried for contempt for its activities on that date. Any acts occurring after the filing of the respondent employers' motion were not properly the subject of a contempt action based upon the initial motion for contempt."

Here, the problem was that the majority of the alleged contemptuous acts committed by the defendants occurred after the date the contempt petition was filed. We have stressed in our prior cases that a contemnor cannot be convicted of contempt for an incident on which he was never charged. *See Doctors Memorial Hosp., Inc. v. Woodruff*, 165 W.Va. 324, 326, 267 S.E.2d 620, 621 (1980) ("[O]ne cannot be convicted of violating something of which he has not been adequately charged."). We spoke to the inappropriateness of this sort of procedure in *State ex rel. Hoosier Eng'g Co. v. Thornton*, 137 W.Va. 230, 239, 72 S.E.2d 203, 208 (1952):

> "To hold that any violation of an injunction decree can be proved if it occurred after service of notice of the issuance of the injunction, whether or not charged in any pleading, would be tantamount to holding that a defendant could be convicted upon proof without having had any notice of the charge against which he was entitled to defend himself."

PG & H argues that the contemnor could have discovered these additional acts of contempt by way of information turned over under their request for a bill of particulars. It appears this is a reference to photographs and incident reports filed by

---

5. PG & H also indicated in its response to the bill of particulars that it would be supplemented should further violations of the injunction come to its attention. PG & H did not supplement its response until the conclusion of the liability phase of the case, when it moved the court under Rule 15(b) of the Rules of Civil Procedure to conform the evidence to the pleadings. From a procedural standpoint, our preliminary injunction law is controlled by Rule 65 of the Rules of Civil Procedure, which provides: "[T]he practice respecting preliminary injunctions shall be in accordance with the practice heretofore followed in this state, including the use of a verified complaint or supporting affidavit." *See Bank of Wheeling v. Morris Plan Bank & Trust Co.*, 155 W.Va. 245, 252, 183 S.E.2d 692, 696 (1971).

the security agency hired by PG & H to protect the premises during the strike. We are not cited nor are we aware of any law that would support this proposition. Such a rule would require the defendant to anticipate what charges of contempt the contemnee had in mind.

Nor are we persuaded by PG & H's argument that after the evidence was developed at trial on the uncharged incidents, it could then move to amend its pleading under Rule 15(b) of the Rules of Civil Procedure.[6] Because of our historic rule regarding the quasi-criminal nature of contempt, and its companion corollary of notice in advance of trial,[7] we do not believe that Rule 15(b) is applicable to a contempt trial on a preliminary injunction.

It is, of course, possible for a contemnee to file additional contempt charges after the original filing, and these may be consolidated with or tried separately from the original charges. This was the procedure followed in *Cross Co. v. United Auto., Aircraft, Agric., Implement Workers*, 377 Mich. 202, 139 N.W.2d 694 (1966), in which the Michigan Supreme Court upheld a finding of contempt against a local union and eight of its members for violation of a temporary injunction prohibiting mass picketing and related activities.[8] *See also L & J Equip. Co. v. United Mine Workers of Am.*, 339 Pa.Super. 51, 488 A.2d 303 (1985); *Charles Mfg. Co. v. United Furniture Workers*, 361 So.2d 1033 (Ala.1978).

The trial court should not have permitted any evidence to be admitted concerning subsequent acts that were not covered in the original contempt petition. Much of the evidence introduced at the jury trial on the contempt issue related to events which occurred after the filing of the contempt petition. This evidence was erroneously admitted and undoubtedly considered by the jury in finding the defendants guilty of contempt. This evidence was also further considered by the trial court in fixing the amount of damages. The failure to follow proper contempt procedure is reversible error, as we clearly indicated in *Maynard* and our other cases.

## III. IMPUTATION OF LIABILITY TO THE UNIONS

The Unions contend the trial court improperly instructed the jury that they had an affirmative duty to take steps to stop their members from violating the court's order.[9] They argue that neither our com-

---

**6.** The material part of Rule 15(b) provides:

> "*Amendments to conform to the evidence.*— When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

**7.** *See, e.g., In Re Yoho*, 171 W.Va. 625, 301 S.E.2d 581 (1983); *Chesapeake & Ohio Sys. Fed'n Bhd. of Maintenance of Way Employees v. Hash*, 170 W.Va. 294, 294 S.E.2d 96 (1982); *Floyd v. Watson*, 163 W.Va. 65, 254 S.E.2d 687 (1979); Syllabus Point 2, *State ex rel. Continental Coal Co. v. Bittner*, 102 W. Va. 677, 136 S.E. 202, 49 A.L.R. 968 (1926); Syllabus Point 2, *State ex rel. Cox v. Taft*, 143 W.Va. 106, 100 S.E.2d 161 (1957); Syllabus Point 1, *State ex rel. Hoosier Eng'g Co. v. Thornton*, 137 W.Va. 230, 72 S.E.2d 203 (1952); Syllabus Point 2, *State ex rel. Taylor v. Devore*, 134 W.Va. 151, 58 S.E.2d 641 (1950); *Mylius v. McDonald*, 61 W.Va. 405,

56 S.E. 602 (1907); *State v. Davis*, 50 W.Va. 100, 40 S.E. 331 (1901); Syllabus Point 1, *State ex rel. Alderson v. Cunningham*, 33 W.Va. 607, 11 S.E. 76 (1890).

**8.** The contempt adjudication of one union member in *Cross Co.* was reversed on the basis that the charging affidavits did not specifically show his participation in the mass picketing. The court concluded that the lower court should have dismissed the charge against this member on the ground that the charging affidavits were fatally lacking in specificity.

**9.** The Unions objected to several instructions at the liability stage of the proceedings below, including the following:

> "PLAINTIFF'S INSTRUCTION NO. 11
> (as amended)
> "Defendants Ronald L. Coon, Charles P. Lacek, Gary W. Nunley, Bernard D. Stull, John P. Yost, Jerry L. Preast, and Roy E. Fleming, each serve defendant Local 2404 in certain official or agency capacities. As such, each are agents of Local 2404, and in their representative capacities were bound not only to

mon law nor the labor relations statutory law of this country justified the trial court's instructions. We begin by noting that the injunction and the subsequent contempt charges arose out of a claim that the union members had engaged in mass picketing and a further claim that violence and intimidation had occurred. Following United States Supreme Court precedent, we recognized in *United Maintenance and Mfg. Co., Inc. v. United Steelworkers of Am.*, 157 W.Va. 788, 204 S.E.2d 76 (1974), that state courts retain jurisdiction to enjoin nonpeaceful picketing, stating in Syllabus Point 1:

"Where jurisdiction over a labor dispute has not been preempted by National Labor Relations Board jurisdiction, a state may regulate picketing by injunction if the injunction has a reasonable basis in prevention of disorder, protection of life or property, or promotion of the general welfare as defined by state

conform their own individual conduct so as to comply with this Court's Temporary Injunction Order, but also to take such acts as reasonably necessary to inform and advise all members of Local 2404 with respect to the contents of such Order, *and to take such other acts as were reasonably necessary to insure compliance with this Court's order.*

"If you find, therefore, by clear and convincing evidence, *that any of the above named individuals failed to take such action as might be deemed reasonably necessary to discharge these duties,* then you may find Local 2404 guilty of civil contempt." (Emphasis added).

"PLAINTIFF'S INSTRUCTION NO. 12

"A labor organization with knowledge that its members are engaging in conduct which violates a court order *has an affirmative duty under the law to exhaust all reasonable means at its disposal in an effort to repudiate such misconduct and to encourage its individual members to conduct themselves in accordance with the court order.* The failure or refusal of a labor organization to take such action is viewed under the law as an approval of its members' misconduct and renders the labor organization guilty of *civil contempt* in the same manner, and to the same extent, as those individual union members who actually engage in such misconduct.

"If you find, therefore, by clear and convincing evidence, that Local Union No. 2404, District 17 or The International, United Mine Workers of America, knew or should have known that their members were engaging in conduct violative of this Court's Temporary Injunction Order, *and nevertheless failed to take effective action against its members to prevent such misconduct from continuing, then you may find each labor organization guilty of civil contempt."* (Emphasis added).

"PLAINTIFF'S INSTRUCTION NO. 13

"The Court instructs the jury that the Injunction Order prohibited the defendants from engaging in the following activities:

1. Standing or placing themselves on or about any private road to the plaintiff's mine and related facilities ..., or in or upon any public road, or highway leading thereto, in such a position or in such a manner as to obstruct, hinder or prevent the free passage of vehicles or persons, or free access to or egress from, the plaintiff's mine and related facilities.

2. Blocking or obstructing the road or approaches to plaintiff's said premises with vehicles or other obstructions, or in any way, or by any means, hindering, interfering with, or preventing trucks, automobiles, other vehicles, or persons traveling on foot or otherwise, from entering or leafing [sic], or passing freely to and from, plaintiff's said properties or premises.

3. Assaulting, attacking or injuring, or threatening to assault, attack or injure, plaintiff's customers, vendors, or employees, or other persons seeking to enter or exit plaintiff's premises or do business with the plaintiff.

4. Damaging any vehicle or property of the plaintiff, plaintiff's employees, or other persons doing business, or seeking to do business, with the plaintiff.

"If you find by clear and convincing evidence that the individually named defendants, or any of them, have engaged in (1) throwing rocks or other projectiles at vehicles coming to and from plaintiff's premises; (2) placing 'jack rocks' at or around the roads leading to and from plaintiff's premises; (3) impairing the vision of the operator of any motor vehicle coming to or from plaintiff's premises through the use of mirrors or similar reflective devices; (4) damaging any vehicle owned by plaintiff or coming to or from plaintiff's mine and related facilities; or have (5) engaged in any similar conduct calculated to impair or restrict the abilities of persons to come and go from plaintiff's mine and related facilities, or to place them in a state of fear or apprehension respecting their travels to and from plaintiff's premises, then you may find each such defendant guilty of *civil contempt.*

"If you find further by clear and convincing evidence that some or all of the defendant labor organizations have, through their respective officers or other agents, *knowingly permitted these acts to occur without taking reasonable action calculated to both repudiate and to defer the continuance of such conduct, then you may find each such labor organization guilty of civil contempt."* (Emphasis added).

law; however, such injunction must be specifically directed to acts or conduct which are designed to accomplish an illegal purpose, and not include those which keep within the protected area of free speech."

■ Because we are involved with a state-created right, the contempt power, we are not necessarily bound by federal labor law in determining the question of the Unions' liability for the actions of their members in violating the court order. However, it is clear under federal law, independently of any labor statute, that the Unions' liability rests upon the common law doctrine of respondeat superior, which was first expressed in *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 395, 42 S.Ct. 570, 577–78, 66 L.Ed. 975, 982 (1922):

"The argument of counsel for the plaintiffs is that because the National body had authority to discipline District organizations, to make local strikes its own and to pay their cost, if it deemed it wise, the duty was thrust on it when it knew a local strike was on, to superintend it and prevent its becoming lawless at its peril. We do not conceive that such responsibility is imposed on the National body. A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are *ultra vires* of corporation. But it must be shown that it is in the business of the corporation. Surely no stricter rule can be enforced against an unincorporated organization like this." [10]

Furthermore, as Justice Brennan pointed out for a unanimous court in *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–17, 100 S.Ct. 410, 414, 62 L.Ed.2d 394, 399 (1979), Congress in the Labor Management Relations Act, 29 U.S.C. § 185 (1947) (Taft–Hartley Act),

"provided in § 301(b) that a union 'shall be bound by the acts of its agents' and in § 301(e) provided that the common law of agency shall govern 'in determining whether any person is acting as an agent of another person.' ... Congress' reason for adopting the common-law agency test, and applying to unions the common-law doctrine of respondeat superior, follows the lead of Mr. Chief Justice Taft in *Colorado Coal Co. v. Mine Workers....*" [11]

While the federal rule set out above applies to suits for damages against a union, there is accorded a different standard to situations which fall within the Norris–LaGuardia Act, 29 U.S.C. § 106 (1931). As pointed out in note 6 of *Carbon Fuel*, 444 U.S. at 216, 100 S.Ct. at 414, 62 L.Ed.2d at 399, Congress has set a higher standard of proof to affix union responsibility in cases where damages are sought for violation of a contempt order: "[T]he Norris–LaGuardia Act ... requires 'clear proof of *actual* participation in, or *actual* authorization of, such acts, or of ratification of such acts after *actual* knowledge thereof.' 29 USC § 106 [29 USCA § 106] (emphasis supplied)."

Several state courts, in the absence of any state statutory standards, have adopted this standard of clear proof in order to harmonize their law with the federal law. The Kansas Supreme Court in *Hiestand v. Amalgamated Meatcutters and Butcher Workman of N. Am.*, 233 Kan. 759, 763–64, 666 P.2d 671, 675 (1983), made this analysis:

"Consistency between our state and federal courts would be obtained by

---

**10.** In a subsequent appeal, *Coronado Coal Co. v. United Mine Workers of Am.*, 268 U.S. 295, 304, 45 S.Ct. 551, 554, 69 L.Ed. 963, 968 (1925), the Supreme Court made this short summary of its former holding: "It must be clearly shown in order to impose such a liability on an association ... that what was done was done by their agents in accordance with their fundamental agreement of association."

**11.** The Supreme Court in note 5 of *Carbon Fuel*, 444 U.S. at 217, 100 S.Ct. at 413, 62 L.Ed.2d at 5, stated: "An international union, of course, is responsible under § 301 for any authorized strike if such strike violates any term of the contract, whether express or implied." (Citations omitted). In the present case, there was no contract in existence and, consequently, the Union's decision to picket would not violate any contract terms.

adopting the clear proof standard of § 6. The United States Supreme Court in *Mine Workers v. Gibbs*, 383 U.S. at 737, 86 S.Ct. at 1144, held 29 U.S.C. § 106 applied to federal court adjudications of state tort claims arising out of labor disputes. Forum shopping would not loom as a possibility. Plaintiffs would have no reason to commence actions in state courts attempting to avoid the clear proof standard of federal courts thereby bypassing Congressional intent. Defendant unions would have no reason to attempt removal to federal courts in an effort to obtain the added protection of the clear proof standard. In addition, consistency in the state and federal courts regarding the burden of proof would eliminate the injustice to those litigants having no right to federal jurisdiction. One may prevail in the state system but fail in the federal system under the same factual situation due to the different burdens of proof required."

█ We have not had occasion to establish a specific standard for determining a union's liability for damages resulting from the violation of a preliminary injunction order. We need not make such determination in this case as the trial court's instructions were erroneous even under the common agency theory of liability. Both *Carbon Fuel* and the earlier *Coronado Coal* cases demonstrate there is no affirmative duty placed on the union to take action to prevent the misconduct of members. Courts since *Carbon Fuel* have uniformly concluded that a union cannot be held liable on the theory that it did not take all reasonable efforts to prevent or terminate a strike or to control illegal picketing.

For liability to attach against a union, it must be shown that through its officials, the union participated in, encouraged, or ratified the misconduct. *E.g., Yellow Bus Lines, Inc. v. Drivers' Chauffeurs & Helpers Local Union 639*, 839 F.2d 782 (D.C.Cir.1988); *Consolidation Coal Co. v. Local 2216, United Mine Workers of Am.*, 779 F.2d 1274 (7th Cir.1985); *Hardline Elect., Inc. v. Int'l Bhd. of Elect. Workers, Local 1547*, 680 F.2d 622 (9th Cir.1982); *California Trucking Ass'n v. Bhd. of Teamsters & Auto Truck Drivers, Local 70*, 679 F.2d 1275 (9th Cir.1981); *Consolidation Coal Co. v. United Mine Workers of Am., Local 1261*, 725 F.2d 1258, 1261 (10th Cir.1984); *Prater v. United Mine Workers of Am., Districts 20 and 23*, 793 F.2d 1201 (11th Cir.1986); *American Bridge Div., United States Steel Corp. v. Int'l Union of Operating Engineers, Local 487*, 772 F.2d 1547 (11th Cir.1985); *Alabama Power Co. v. Local Union No. 1333, Laborer's Int'l Union of N. Am.*, 734 F.2d 1464 (11th Cir.1984); *Old Ben Coal Co. v. Local Union No. 1487 of United Mine Workers of Am.*, 601 F.Supp. 1061 (S.D.Ill. 1984).[12]

█ The evidence does not clearly and convincingly establish agency such that the International, District, or local union can be held in contempt. It is undisputed that no officer or official representative of the International or District committed any of the contumacious acts or was present when any such proven acts were committed. While the International did authorize the selective strike and pay strike benefits, the uncontroverted evidence shows that the picketers were given written instructions

12. Moreover, the agency proof must be shown as to each of the union levels, i.e., Local, District, and International, as indicated by *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 539 (3d Cir.1983):

"To be held liable for the actions of individuals, a union must be shown to have 'instigated, supported, ratified or encouraged' the particular activities in question. *Kerry Coal Co. v. United Mine Workers of America*, 637 F.2d 957, 963 (3d Cir.), *cert. denied*, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). *See Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). Calling a strike is not, by itself, sufficient to make the Union responsible for all illegal conduct committed during that strike. *See Kerry Coal, supra.* In addition, when damages are claimed against an international union, a district, and a local, the plaintiff must make a separate showing of agency for each defendant. In the present case, there was no finding that any level of the UMWA authorized or in any way support the individuals who threatened the Hannas. Thus, on this record none of the Union entities, may be held responsible for that conduct."

*See also American Bridge Div., U.S. Steel Corp. v. Int'l Union of Operating Engineers, Local 487*, 772 F.2d 1547 (11th Cir.1985); *Consolidation Coal Co. v. Local 2216, United Mine Workers of Am.*, 779 F.2d 1274 (7th Cir.1985).

telling them to engage in only peaceful picketing. The International also conducted formal instructional classes and gave follow-up instructions not to engage in violent picketing.

International officials went to the picket line periodically and not only repeated those instructions on nonviolence, but also removed persons who should not have been there or who had been accused of violating the Unions' picketing rules. The International specifically prohibited drinking of alcoholic beverages and threatened suspension of strike benefits for noncompliance. In addition, shortly after the temporary injunction order was entered, International officials informed the strikers that the court order had to be obeyed. There was no showing that the District officials or local union officials were in any manner advising, encouraging, or ratifying any of the unlawful acts.

PG & H places a great deal of reliance on *Consolidation Coal Co. v. Local 1702, United Mine Workers of Am.,* 709 F.2d 882 (4th Cir.1983), but we believe it inapplicable to the facts of this case. The principal issue discussed was whether a local union could be found liable under a "mass action" theory because all of its members, including the local union officials, had engaged in a "wildcat strike" over the suspension of a union member. Generally, the mass action theory fixes liability on the union itself where all of its members take the same action in concert.

The question in *Consolidation Coal* was whether *Carbon Fuel* had eliminated this theory of union liability by virtue of this language: "Congress limited the responsibility of unions for strike in breach of contract to cases when the union may be found responsible according to the common law rule of agency." 444 U.S. at 216, 100 S.Ct. at 413, 62 L.Ed.2d at 399. The Fourth Circuit in *Consolidation Coal* found that the mass action theory was still

available as a means of affixing liability against a local union in addition to the traditional agency theory.[13] However, PG & H admits in its brief that "[t]he mass action theory is not pertinent to this appeal."

To the extent that *Consolidation Coal* holds that the failure of local union officials to use reasonable efforts to return striking miners to work is evidence of the union's ratification of the strike, we find it to be completely at odds with *Carbon Fuel* and decline to follow it. We have not encountered a single court since *Carbon Fuel,* except *Consolidation Coal,* which has imposed liability upon a union under common law agency principles for its failure to take reasonable action to get its members back to work.

The jury instructions under the foregoing law were erroneous and should not have been given. Furthermore, under the evidence, we find that the unions were not shown to be liable under a common law agency theory since they did not authorize or ratify the misconduct. Had it not been for the misconception, as shown by the jury instructions, that the unions could be held liable for failing to take all reasonable precautions to stop the misconduct, the case should not have been submitted to the jury.[14]

For the foregoing reasons, the judgment of the Circuit Court of Kanawha County is reversed.

Reversed.

McHUGH, C.J., concurs and reserves the right to file a concurring opinion.

BROTHERTON and NEELY, JJ., dissent and reserve the right to file dissenting opinions.

McHUGH, Justice, concurring:

Contrary to the discursive wailing of the dissenting opinion, I believe that the result reached in this case was legally sound.

---

**13.** It is clear that this mass action theory is utilized only against a local union. Several circuit courts of appeals have taken an opposite view from the Fourth Circuit and have concluded that *Carbon Fuel* has abolished the mass action theory of liability. *Consolidation Coal Co. v. Local 2216, United Mine Workers of Am.,* supra; *Consolidation Coal Co. v. United Mine Workers of Am., Local 1261, supra.*

**14.** In view of our holding with regard to lack of notice and improper jury instructions, we decline to discuss the other alleged errors.

Interestingly, although the dissenting opinion rails at the majority opinion and the decisions used to support it, the dissenting opinion is barren of authority to bolster it.

In a feeble attempt to confuse elementary principles applicable to either criminal or civil contempt, whether intentionally or otherwise, a fundamental legal requirement is not recognized by the dissenting opinion. Whether the contempt proceeding be civil or criminal, notice and an opportunity to be heard are required for either. *See, e.g.,* syl. pt. 2, *State ex rel. Hoosier Engineering Co. v. Thornton,* 137 W.Va. 230, 72 S.E.2d 203 (1952) ("In a prosecution for contempt of court for an alleged violation of an injunction decree, not committed in the presence of the court, the defendant is entitled to be fully and plainly informed of the character and cause of the accusation."); *Chesapeake & Ohio System Federation v. Hash,* 170 W.Va. 294, 299, 294 S.E.2d 96, 101 (1982) (contemnor is entitled to certain fundamental procedural safeguards to insure that contemnor is not deprived of liberty or property without due process of law; "[t]he most basic of the procedural safeguards guaranteed by the due process provisions of our state and federal constitutions are notice and the opportunity to be heard, which are essential to the jurisdiction of the court in any pending proceeding."); *Ex Parte Mylius,* 61 W.Va. 405, 407, 56 S.E. 602, 603 (1907) (legal notice of contempt charge is indispensable to a judgment that has any force). In the case before us, notice was absent.

It would have been more helpful if the dissenting opinion was not compelled to resort to old-fashioned "podium pounding." Perhaps, after research on the notice issue, that was all that remained.

BROTHERTON, Justice dissenting:

I must dissent to the majority opinion in this case, in both reasoning and result. I am compelled to point out a fact virtually ignored by the majority. This case involved an action for civil contempt, not criminal, or even "quasi-criminal" contempt. The jury verdict in this case resulted in monetary fines, not a term of imprisonment for any of the defendants. *See* syllabus point 1, *Hendershot v. Hendershot,* 164 W.Va. 190, 263 S.E.2d 90 (1980). It has long been held that the primary distinction between civil and criminal contempt proceedings is the constitutional safeguards required in criminal contempt proceedings that are not guaranteed in civil contempt actions.[1] Consequently, absent the hallmarks that make a contempt proceeding criminal in nature, a party to a civil contempt action is not owed the same constitutional safeguards given to a criminal contemnor.

The majority, however, found that Rule 15(b) of the West Virginia Rules of Civil Procedure does not apply to this case. In a sweeping generalization that ignores all the prior efforts made to distinguish civil and criminal contempt, the majority characterizes all contempt proceedings as "quasi-criminal" and thus apparently subject to all the rights due a criminal defendant. Few, if any, of the cases cited by the majority speak with any great specificity about the "quasi-criminal" character of all contempt actions. To the contrary, in *In re Yoho,* 171 W.Va. 625, 301 S.E.2d 581 (1983), the Court takes great pains to distinguish between the four different types of contempt. *Id.* 171 W.Va. at 627–629, 301 S.E.2d at 583–85. Nowhere in *Yoho* do I find a pronouncement of the "historic rule" so grandly cited by the majority which treats civil contempt as "quasi-criminal."[2] Further, in *Doctors Memorial Hospital v. Woodruff,* 165 W.Va. 324, 267 S.E.2d 620 (1980), a per curiam opinion heavily relied upon by the majority, the Court notes that *criminal* contempt proceedings are quasi-criminal in nature and therefore subject to the Rules of Criminal Procedure. Similarly, in *State ex rel. Koppers Co., Inc. v. International Union of Oil, Chemical & Atomic Workers,* 171 W.Va. 290, 298 S.E.2d 827 (1982), this Court found that

1. Martineau, *Contempt of Court: Eliminating the Confusion Between Civil and Criminal Contempt,* 50 U.Cinn.L.R. 677,681 (1981). *See also State ex rel. Koppers Co., Inc. v. International Union of Oil, Chemical & Atomic Workers,* 171 W.Va. 290, 298 S.E.2d 827, 829 (1982).

2. In fact, *Yoho* quotes with approval *In Re Bianchi,* 542 F.2d 98 (1st Cir.1976), which recognized that civil contempt proceedings for recalcitrant grand jury witnesses did "not require meaningless formalities that would only serve to delay the proceedings." *Id.* 171 W.Va. at 630, 301 S.E.2d at 587.

criminal contemnors are entitled to the same rights as other criminal defendants. *Id.* 171 W.Va. at 293, 298 S.E.2d at 829. Nowhere in either opinion are civil contempt actions given the same status as criminal contempt actions.

Moreover, the majority's reliance on *State ex rel. United Mine Workers of America v. Maynard,* 176 W.Va. 131, 342 S.E.2d 96 (1985), is equally ill-founded. The majority cites to *Maynard,* at footnote 2, for the proposition that parties must be given notice of the particular acts that violated the court's order. However, footnote 2 refers to *Koppers, Doctors Memorial Hospital,* and *Yoho,* discussed above, in support of this proposition despite the fact that the latter two cases involve criminal contempt. *Yoho,* which addressed the due process issues of the different types of contempt proceedings, merely found that the defendant's due process rights had been adequately protected by being informed prior to and after his refusal to testify that his actions were contemptuous.

In the present situation, the plaintiffs were put on notice, first by the temporary injunction and later by the pleadings, that any violation of the temporary injunction would stand as an act of contempt of that court order. Moreover, the evidence presented at trial, amended to conform to the pleadings, gave adequate notice of the charges as permitted in civil litigation. The majority's sudden assumption that specific written notice was required of each additional act of civil contempt after the original pleadings were filed makes a leap of faith at which even the most ardent legalist would marvel.

The majority spends a great deal of time bemoaning the lack of notice given the defendants regarding the specific acts that violated the temporary injunction. Hogwash. The injunction was very specific in its terms and gave the defendants more than adequate notice that if they performed any of the acts forbidden therein, they would be in violation of that court order. To say that the defendants required additional notice before they could be tried for each new injunction violation, after knowingly violating the court order, is like arguing that Moses should have been given second notice he was breaking the Ten Commandments when he threw the tablets down in a fit of rage.

After reviewing the facts surrounding this case and the law cited by the majority, the majority's classification of all contempt proceedings as "quasi-criminal" is nothing more than a transparent attempt to weaken the power of the courts to control strike activity in violation of a valid court order. The contempt power of a court is an inherent one, necessary to the very existence of that court. *Ex parte Robinson,* 86 U.S. (19 Wall) 505, 22 L.Ed. 205 (1873); *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 3 L.Ed.259 (1812). While we agree contempt power must be carefully regulated, it is a necessary power and one properly utilized by the court below in this case. This case, along with *Hendershot,* virtually emasculates a state court's power to enforce an injunction.

For the foregoing reasons, I must dissent to the majority's opinion.

I am authorized to say that Justice NEELY joins with me in this dissent.